## GILFORD YORK, Plaintiff, v. GENERAL UTILITY CORPO-RATION and James Rheinfrank, Defendants.

### (176 N. W. 352.)

**Electricity — verdict of jury sustained by the evidence.**
1. In an action by the plaintiff against the defendants, to recover damages for injuries sustained on account of the negligence of the defendants in the operation of an electric light plant, and the instrumentalities connected therewith, whereby the plaintiff was severely injured and burned, and one of his hands thereby crippled, and the question of defendants' negligence and plaintiff's contributory negligence and assumption of risk having been submitted to a jury, and the jury having returned a verdict in plaintiff's favor in the sum of $15,-000,—it is *held*, upon an examination of the record, that the verdict is sustained by the evidence.

**Electricity — contributory negligence — choice of methods of work.**
2. The plaintiff was called to one W. J. Payne's residence to make repairs upon the electric wires therein. Ordinarily, such wires contained a voltage of 110. By reason of defendants' negligence, two primary wires rested upon an upper crossarm on a pole, loosely, and were uninsulated. A secondary wire, which was on the second crossarm, extended upward and immediately under the two unfastened primary wires, and then led to certain houses in the vicinity, to which it conveyed electric current; among others, being the Payne house.

Each of the primary wires contained a voltage of 2,300. By reason of the close proximity to the secondary wire which passed under and very near to them, and, by reason of the noninsulation of the primary wires, the voltage of 2,300 contained in such wires was transmitted to the secondary wire, and, by

it, transmitted to the Payne residence, where plaintiff, upon proceeding to make the repairs, and in attempting to take hold of one of the disconnected wires in the basement of the Payne residence, received the excessive voltage of 2,300.

If plaintiff, before going to the basement to make the repairs, had turned off the switch, he would not have been injured. When he went to the basement, he placed a dry board under his feet before starting to make the repairs. If there had been only 110 volts in the wires to be repaired, instead of 2,300, the use of the board would have been a safe method.

The defendants claim that plaintiff had the choice of two methods, one of which was dangerous and the other safe, and that he chose the dangerous method. The evidence shows that the method selected by plaintiff was safe had the wires contained only 110 volts. It further shows that that method became unsafe by reason of the negligence of the defendants in failing to properly insulate the primary wires in question.

**Special verdict — questions contained in special verdict held to cover merits of the case.**

3. It is further *held*, that the matters involved in the case, which were, by the court, submitted to the jury by questions contained in a special verdict, involved and covered the merits of the case.

Opinion filed December 27, 1919.

Appeal from the District Court of Eddy County, *C. W. Buttz,* Judge.

Judgment affirmed.

*Lawrence & Murphy* and *Watson, Young, & Conmy,* for defendants and appellants.

"If two ways are open to a person to use, one safe and the other dangerous, the choice of the dangerous way, with knowledge of the danger, constitutes contributory negligence." 29 Cyc. 520.

"In every case there is a preliminary question for the judge whether there is evidence from which the jury may properly proceed to find a verdict." Anderson v. Phillips, 160 N. W. 315.

There is no liability of the defendant Rheinfrank to any person because of the method of construction of this defendant company of its business instrumentalities. There is no question about the law on that point. Floyt v. Shenango Furnace Co. 186 Fed. 539; Bryce v. Southern R. Co. 125 Fed. 959; Mechem, Agency, §§ 560, 573; Greenberg v. Whitcomb Lumber Co. 90 Wis. 231, 28 L.R.A. 439, 63 N. W. 93; Murray v. Usher, 117 N. Y. 542; Drake v. Hagan, 108 Tenn. 265, 67 S. W. 470.

"At most, the allegation charges no more than nonfeasance, mere omission on the part of the foreman to perform the master's duty as to inspection and repairs. For this the foreman is not liable to the plaintiffs." Macutis v. Cudahy Packing Co. 203 Fed. 291.

"Where a joint tort is charged there can be no recovery on proof of one or more separate torts." Goodman v. Coal Twp. 206 Pa. 621, 56 Atl. 65.

"Proof of separate acts not committed with a common design or for a common purpose, and without concert, will not authorize a joint recovery. . . . Where two or more commit separate trespasses, or do separate acts tending to produce injury to another without concert, there is no joint liability, and consequently there can be no joint recovery." Howard v. Union Traction Co. (Pa.) 45 Atl. 1077; Weist v. Philadelphia, 58 L.R.A. 666; Jayne v. Loder, 7 L.R.A.(N.S.) 991; William Tackaberry Co. v. Sioux City Service Co. 40 L.R.A.(N.S.) 114; Fortmeyer v. National Biscuit Co. 37 L.R.A.(N.S.) 573.

For separate and distinct wrongs in nowise connected by the ligament of a common purpose, actual or implied by law, the wrongdoers are liable only in separate actions, and not jointly in the same action. Citing cases, 15 Enc. Pl. Pr. p. 562; Livesay v. First Nat. Bank, 6 L.R.A.(N.S.) 601, 602.

In a special verdict, if any fact essential to sustain a judgment is not found, there can be no judgment on the verdict. McGongie v. Godon, 11 Kan. 167; Bibb v. Hall, 101 Ala. 87, 14 So. 98; Brock v. Louisville & N. R. Co. 114 Ala. 431, 21 So. 994; Carter v. Dublin Bkg. Co. 104 Ga. 569, 31 S. E. 407; Chicago & N. W. R. Co. v. Dunleavy, 129 Ill. 132, 22 N. E. 15; Rary v. Lee, 16 Ind. App. 121, 44 N. E. 318; Shipps v. Atkinson, 8 Ind. App. 505, 36 N. E. 375; Moore v. Moore, 67 Tex. 293, 3 S. W. 284; Kerr v. Hutchins, 46 Tex. 384; Ward v. Cochran, 150 U. S. 597, 37 L. ed. 1195, 14 Sup. Ct. Rep. 230; R. v. Haues, 2 Ld. Raym. 1518.

And an omission of a material fact from a special verdict is not cured by the fact that the circumstances stated may be sufficient to warrant an inference or presumption of the existence of the matter omitted. Jones v. State, 2 Swan, 399.

Nor can anything be taken by implication or intendment. McCormick v. Royal Ins. Co. 163 Pa. 184, 29 Atl. 747; Vansyckel v. Stewart,

77 Pa. 124; Loew v. Stocker, 61 Pa. 347; Morse v. Chase, 4 Watts, 456; Craven v. Gearhart, 1 W. N. C. 257; Lee v. Campbell, 4 Port. (Ala.); Sewell v. Glidden, 1 Ala. 52; Brock v. Louisville & N. R. Co. supra; Noblesville Gas & Improv. Co. v. Lehr, 124 Ind. 79, 24 N. E. 579; Bloomington v. Rogers, 9 Ind. App. 230, 36 N. E. 439; Lake Shore & M. S. R. Co. v. Stupak, 123 Ind. 210, 23 N. E. 246; Rice v. Evansville, 108 Ind. 7, 58 Am. Rep. 22, 9 N. E. 139; Pittsburgh, C. & St. L. R. Co. v. Spencer, 98 Ind. 186; Shipps v. Atkinson, supra; Alexandria Min. & Exploring Co. v. Irish, 16 Ind. App. 534, 44 N. E. 680; Louisville, N. A. & C. R. Co. v. Bates, 146 Ind. 564, 45 N. E. 108; O'Neal v. Chicago & I. C. R. Co. 132 Ind. 110, 31 N. E. 669; State v. Burdon, 38 La. Ann. 357; State v. Ritchie, 3 La. Ann. 511; Com. v. Dooly, 6 Gray. 360; Com. v. Fishblatt, 4 Met. 354; Birckhead v. Brown, 5 Hill, 634; Williams v. Willis, 7 Abb. Pr. 90; Brush v. Batten, 15 N. Y. S. R. 548; Jenks v. Hallet, 1 Caines, 60; State v. Belk, 76 N. C. 10; State v. McGhee, 143 N. C. 640, 57 S. E. 157; State v. Stephanus (Or.) 99 Pac. 428; Jones v. State, 2 Swan, 399; Tunnell v. Watson, 2 Munf. 283; Farr v. Newmand, 4 T. R. 621.

Where negligence is in issue, and the facts are such that different conclusions may be drawn, the primary facts from which such conclusions are drawn by the jury must be stated in a special verdict. Wabash R. Co. v. Miller, 18 Ind. App. 549, 48 N. W. 663; Walkup v. May, 9 Ind. App. 409, 35 N. W. 917; Pittsburgh, C. & St. L. R. Co. v. Spencer, 98 Ind. 186.

"A special verdict finding that one of the parties to the action has been guilty of negligence is a mere statement of a conclusion, and will not support a judgment." Chicago, St. L. & P. R. Co. v. Burger, 124 Ind. 275, 24 N. E. 981.

And an interrogatory as to whether or not the injury in question was received without any fault or negligence upon the part of the defendant is improper, as involving both the law and the facts. Huntington County v. Bonebrake, 146 Ind. 317, 45 N. E. 470; Hadley v. Lake Erie & W. R. Co. 21 Ind. App. 675, 51 N. E. 337.

Interrogatories submitted to a jury in connection with a general verdict should be so clear and concise as to be readily understood and answered by the jury. Freedman v. New York, N. H. & H. R. Co. 81 Conn. 601, 71 Atl. 901.

They should be made up of sufficient direct questions to cover singly all material issues of fact raised, by the pleadings and controverted on the evidence, each question admitting of an answer in the affirmative or negative. Hallum v. Omro, 122 Wis. 337, 99 N. W. 1051; Mauch v. Hartford, 112 Wis. 40, 87 N. W. 816; Goessel v. Davis, 100 Wis. 678, 76 N. W. 768; Flaunery v. Kansas City, St. J. & C. B. R. Co. 23 Mo. App. 120.

*Rinker & Duell, Julian E. Brown,* and *Daniel H. Hollihan* (*T. D. Sheehan,* of counsel), for respondent.

"One injured by an electric wire cannot be presumed, in the absence of evidence, to have had knowledge that moisture delayed the insulation of such a wire" Giraudi v. Electric Emp. Co. (Cal.) 40 Pac. 108; Predmore v. Consumers' Light & P. Co. 91 N. Y. Supp. 116.

"A lineman of a telephone company, repairing wires attached to the same pole as electric light wires, was not negligent in allowing a wire which he was handling without insulation to come in contact with the light wire, if he was justified in believing that the insulation which the light company was required by ordinance to use on its wires was sufficient to prevent the escape of the current by the contact of another wire, and that this particular wire was so insulated." Knowlton v. Des Moines Edison Light Co. (Iowa) 90 N. W. 918; Mangan v. Louisville Electric Light Co. (Ky.) 91 S. W. 703; Gilbert v. Duluth General Electric Co. (Minn.) 100 N. W. 653.

"One working on a roof of a building near wires of an electric company may presume that they are properly insulated, unless the defect is visible to such examination as he ought to make." Will v. Edison Electric Illuminating Co. (Pa.) 50 Atl. 161; McCabe v. Narragansett Electric Lighting Co. (R. I.) 59 Atl. 112.

"In places where electric wires should be insulated for safety to persons, one may assume that they are so insulated, if he knows not to the contrary." Thomas v. Wheeling Electric Co. (W. Va.) 46 S. E. 216; Commonwealth Electric Co. v. Rose (Ill.) 73 N. E. 780; Paine v. Electric Illuminating & P. Co. 72 N. Y. Supp. 279.

"We have no statute in this state fixing any rule upon the subject of the joinder of parties defendant in actions in tort. . . . We must, therefore, refer to the rules of the common law. The authorities even

upon this branch of the subject are by no means harmonious, but the weight of reason sustains the right of the joinder. The following authorities sustain this proposition." Newman v. Towle, 37 N. J. L. 89; Greenburg v. Whitcomb, 90 Wis. 225; Wright v. Crompton, 53 Ind. 337; Consolidated v. Keefer, 26 Ill. App. 466; Southern v. Sittasen (Ind.) 74 N. E. 898; Lynch v. Elektron, 88 N. Y. Supp. 70; Wright v. Wilcox, 19 Wend. 343; Colegrove v. New York, 20 N. Y. 492; Cuddy v. Horn (Mich.) 10 N. W. 32.

The negligence of a mine superintendent in permitting the use of an unsafe shaft was not merely nonfeasance, but that the same amounted to misfeasance, and that he could be joined in an action with his employer for injuries resulting from such negligence. Lewisville Ore Co. v. Vincent, 95 S. W. 179; Southern R. Co. v. Rowe, 59 S. W. 463; Eastment v. Texas R. Co. 92 S. W. 838; Ellis v. McMaughter, 42 N. W. 1113; Lous v. Davis, 70 Pac. 491.

"The section boss and a railway company can be sued when the sole ground of the liability of the railway company is in the act of the section boss alone." Morrison v. R. Co. 74 Pac. 1064; Howe v. R. Co. (Wash.) 70 Pac. 1100; Able v. R. Co. 73 S. C. 173; Chesapeake R. Co. v. Dixon, 179 U. S. 131.

Injury to a property owner whose building an electric light company had contracted to light by means of a harmless voltage through incandescent electric lamps, the equipment furnished by the company, by the escape of the current from the wires when he attempts to turn the light at a particular lamp, raises a presumption of negligence on the part of the company. Alexander v. Nanticoke Light Co. 209 Pa. 571; Crow v. Nanticoke Light Co. 209 Pa. 580; Reynold v. Narragansett Electric L. Co. 59 Atl. 393; Royal Electric Co. v. Heve, Rap. Jud. Quebec, 11 B. R. 436.

"The burden of establishing the defense, not only of contributory negligence, but of assumption of risk, was upon the defendant." Shebeck v. Nat. Cracker Co. (Iowa) 94 N. W. 930; Nicholas v. R. Co. 90 Iowa, 85, 57 N. W. 694; Thompson v. R. Co. 70 Minn. 279, 72 N. W. 692; Nadau v. White, 76 Wis. 120, 43 N. W. 1135; Wyldes v. Patterson (N. D.) 153 N. W. 644.

GRACE, J. This action is one to recover for personal injuries received by the plaintiff, on the 6th day of July, 1916, at the city of

New Rockford, North Dakota, which injuries are alleged to be due to the negligence of the defendants.

The case was twice tried to the court and a jury. In the first trial, the jury returned a verdict in plaintiff's favor for $14,750. From the judgment entered upon that verdict, an appeal was taken to this court, and, for errors in the instructions of the court, it was reversed, and the case remanded for a new trial, which was had, the jury returning a verdict for plaintiff in the sum of $15,164.10.

No motion was made for a new trial after the entry of the last judgment. The case again comes before this court on appeal from the judgment.

The material facts in the case are, in substance, as follows: The General Utility Corporations owns and operates, among others, an Electric Light and Power Plant at New Rockford, from which it furnished its patrons electric light and power.

James Rheinfrank, at the time of the accident, and sometime prior thereto, was the superintendent of the plant. The plaintiff, prior to and at the time of the accident, was in the employ of one Beaudry, who was operating a heating, plumbing, and electrical shop in the city of New Rockford.

The defendant, in conducting its business at New Rockford, had erected poles, which were strung with wires for the purpose of transmitting an electric current for light and power purposes. It had erected poles and strung wires thereon, on Stenson and Lamborn streets, which extended east and west, parallel, and one block distant from each other. Between these two streets, there extended an alley, in and along which there were poles and wires used for furnishing light to its patrons who reside on each of these streets.

The poles, to which particular attention is directed in this action, are in the alley between the two cross streets, known as Fourth street on the east, and New Haven street on the west. The poles were about 7 inches in diameter. To them were attached the crossarms, which were 6 feet in length, thus extending on either side of the pole a little less than 3 feet.

The house of W. J. Payne and the house of Kellington face Stenson street. Each were furnished with an electric current for lighting pur-

poses.   The Lasher house faces Lamborn street; this, likewise, was furnished with an electric current.

On each of the poles in this alley, there were two crossarms.   On the top crossarm, there were five primary wires, each carrying a voltage of 2,300 volts.   On the second crossarm were the secondary wires, which received their current from the primary wires, through a transformer, thus reducing the voltage from 2,300 to 110 volts.

The light to the Payne, Kellington, Lasher, and other homes along that alley, was furnished by secondary wires, which carry a voltage not to exceed 110 volts.

In the alley, at the entrance from New Haven street, and east along the alley, are poles, and on them, on the top crossarm, on the right-hand side of the poles, which is the south side, there are three primary wires, used to furnish power and light to the city.   On the left hand or north side of the poles, on the top crossarm, there are two primary wires which were used only in connection with the secondary wires in furnishing light to the different homes along the alley.

In this alley, towards the east, on the second crossarm, to the right or south side, there was one secondary wire, and to the left or north of the poles, on the same crossarm, there were two of the secondary wires.   Two of the secondary wires were positive, and the other, which was in the center, was negative or neutral, and was used in furnishing light to any of the houses, and was always connected with one of the positive wires, thus reducing the voltage to 110 volts at the homes.

On the top crossarms of these poles, there were six wooden pegs, three on either side of the pole, and they were approximately 7 inches inches high above the crossarm.   They were used for the purpose of putting thereon glass cups as insulators, to which the wires carrying electric currents could be tied when strung upon the poles.   A similar arrangement was had with reference to the second crossarms.   On a pole in this alley, behind the Kellington house, the center, secondary, neutral wire, on the second crossarm, was attached to the third wooden peg, which was to the left or north side of the pole, and, from that peg, a wire led to the first crossarm, and attached to the third peg of the first crossarm, to the left or north of the pole, and, from there, this wire led directly north or to the left, to the Lasher home on Lamborn

street. It passed underneath and close to the primary wires, each of which carried a voltage of 2,300 volts.

The two primary wires, which were on the first crossarm to the left or north of the poles, which were used to carry the current for furnishing light to the homes along the alley, are claimed to have been placed there in the late fall of 1915, or in the spring of 1916, by James Rheinfrank, superintendent of the defendants' plant.

It appears, there were no glass insulators placed upon the pegs at that time, and these primary wires, each carrying the 2,300 voltage, were placed on top of the crossarms, between the first and second, and the second and third, pegs, and simply rested loosely upon the crossarms, and were not attached to anything. These wires were thus placed upon the pole, behind the Kellington house, and came in close proximity, or possibly in contact with the secondary wire, which was stretched upward from the second crossarm to the first crossarm, and which extended directly beneath the primary wires which were on the north side of the pole, having been allowed to lie loosely on the crossarms, as above stated, and which, as stated, came in close proximity, or possibly in contact, with the secondary wire, which carried the current to the Lasher house and all of the houses along this particular alley. The current which it carried should not exceed 110 volts. This was the wire which conducted the current to the home of W. J. Payne, where the plaintiff was injured on the day in question. This wire, by reason of its close proximity, or possibly its contact with the primary wires referred to, which were unprotected, it is claimed, that day, carried a voltage of 2,300 volts instead of 110 volts.

On July 6, 1916, the plaintiff, in pursuance of his duties to his employer was engaged in wiring a house in a small town, some 8 miles south of New Rockford. He returned from there to New Rockford about 4 o'clock in the afternoon, and, having gone to the shop of his employer, he learned there was trouble with the lights at the Payne and Kellington homes. He and his helper went to the Payne home, where he found no one except a boy about twelve years of age. The plaintiff went to the second floor of this house, inserted some new fuses, and tested the lights, which he found to be all right after the insertion of the new fuses.

He then tested the lights on the first floor, and found them in proper

condition and operating in proper manner. He was then informed by the boy in question, that the electric wire in the basement was broken. He and the helper went to the basement. He asked the helper to get him a board upon which to stand, which was done, and he placed the board upon the floor of the basement, and stepped upon it with both feet. He reached upward to take hold of the end of the wire with his left hand, intending to splice the ends of the wire, and immediately received a severe shock, which rendered him unconscious. He got both hands, his arms, and one toe on the right foot badly burned. He received a burn across the chest and on the top of the head. It appears, prior to the time of this accident, the plaintiff had lost the second and third fingers of the left hand, being off from the point where they joined the hand. He had theretofore also lost a portion of the little finger of that hand from a point just below the knuckle of middle joint thereof.

It appears that the plaintiff's right hand was in normal condition prior to the time of the accident, and that it was so injured by the burns that several of the fingers were badly crippled, the little finger being so injured that it assumed a position such as to leave the tip of it resting in or near the palm of the hand. The second finger was also badly crippled, so that he could use it but very little. This was, likewise, true of the index finger, and the thumb had very little motion in it, and the third finger was amputated. The first and second fingers are, by reason of the accident, joined together by a tissue, in form similar to a web.

The plaintiff was rendered unconscious by reason of the injuries, and so remained for a considerable period of time. He suffered intense pain for some twenty days; he had considerable trouble with his heart for a period of a couple weeks, and was subject to sinking spells, at such times becoming unconscious.

There was a deep burn on plaintiff's arm between the elbow and the shoulder, about 4 inches in width around the arm. There was also a severe burn on the back of his head at the top of the spine. The evidence shows the plaintiff to have been severely injured and burned.

At the request of the defendants, the court directed the jury to find a special verdict. Under subdivision 2 of § 7632, Comp. Laws 1913:

"A special verdict is that by which the jury find the facts only, leaving the judgment to the court."

Section 7633, Comp. Laws 1913, provides that "the special verdict . . . shall be prepared by the court in the form of questions in writing, which shall be confined to matters involving the merits of the case and shall admit of direct answer and the jury shall make their answer thereto in writing."

In the pursuance of its duty, as defined by said section, the court did prepare such special verdict, in the form of written questions, which were confined to matters involving the merits of the case, and which admitted of direct answers, and submitted such written questions to the jury for answer. Such questions, so submitted, had reference to, and included, questions concerning the negligence of the defendant, the contributory negligence, if any, of the plaintiff, the assumption of the ordinary risk of his employment by the plaintiff, the nature and permanence of his injuries, and the amount of damage sufficient to compensate him for his injuries.

The following is a copy of the special verdict:

Question No. 1: Were the two primary wires, on the top crossarm, on the north side of the pole behind the Kellington home, left unfastened so that one of the same came in contact with the secondary wire attached to the same crossarm?

Answer: Yes.

Question No. 2: Was there an excessive voltage in the wires, in the home of W. J. Payne, at the time the plaintiff met with the injuries?

Answer: Yes.

Question No. 3: If you answer question No. 2, "Yes," was such excessive voltage of electricity in the wires in the Payne home, on July 6, 1916, caused by reason of a contact of a primary wire and the secondary wire on the top crossarm of the pole behind the Kellington home?

Answer: Yes.

Question No. 4: Was the secondary wire, leading from the second crossarm to the first crossarm, upon the pole behind the Kellington home, and from that crossarm to the Lasher home, there at the time the two primary wires were placed upon the top crossarm of the same pole?

Answer: Yes.

Question No. 5: If you answer the first question, "Yes," then were the defendants guilty of the want of ordinary care in the manner of placing the said wires on the pole behind the Kellington home?

Answer: Yes.

Question No. 6: If you answer question No. 5, "Yes," then was such want of ordinary care the proximate cause of plaintiff's injury?

Answer: Yes.

Question No. 7: Was the plaintiff, at the time he received the injuries complained of, guilty of the want of ordinary care, which contributed to produce the injuries complained of?

Answer: No.

Question No. 8: Were the injuries received by the plaintiff the result of the ordinary risk of his employment?

Answer: No.

Question No. 9: Are any of plaintiff's injuries of a permanent nature?

Answer: Yes.

Question No. 10: Did plaintiff sustain any damage by reason of the injuries received by him?

Answer: Yes.

Question No. 11: If he did sustain damage, what sum of money will compensate plaintiff for his injuries?

Answer: $15,000.

W. L. Daniels,<br>Foreman.

Dated this 11th day of February, A. D. 1919.

The defendant assigns twenty-one errors of law, and seven specifications of the insufficiency of the evidence to sustain the verdict. We cannot take the space to consider each of the errors and specifications separately, but, after full consideration of all of them, we will refer to some of the more material and important ones.

The court was not in error in refusing defendants' request to direct a verdict in favor of the defendants and against the plaintiff, on the ground that no negligence, which was the proximate cause of the injury, had been established against the defendants.

Reasons assigned by the defendants for asking that a verdict be

directed in favor of the defendants and against the plaintiff were as follows: That there was a failure of proof to establish the conditions which existed, to be unsafe or dangerous; or that there was any condition created or maintained by the defendants, which was not sufficient and safe under all the conditions; and, further, that there was no proof to establish the defendant corporation had jurisdiction or control over the electrical wires, or appliances inside the house where the accident occurred; that there was no proof as to the good or safe condition of the privately owned wires and appliances inside of the house where the injury occurred; that it is left to conjecture to learn as to whether or not the accident might have occurred through some defect in the construction inside the house, over which the defendant company had no control. Further, that there was no joint nor concerted negligence of the defendants; that the specific acts of negligence, attempted to be established by the testimony, apply only in part to the defendants; that all of the acts charged, or upon which joint liability would be submitted, do not apply to both the defendants; that the testimony shows the plaintiff assumed the risk under conditions which were known to him, or should have been known. Further, that the plaintiff is guilty of contributory negligence in failing to use safeguards, and that such could have been used, and for the further reason that it is admitted by the plaintiff that there were two methods of performing the work in question,—one entirely safe, and one in which there was an element of chance,—and that the plaintiff admitted that he took the element of chance, when he knew there was a safe method. Further, that the testimony shows, as a whole, there was contributory negligence on the part of the plaintiff.

All of the foregoing are relied upon by the defendants, in support of their motion for a directed verdict, as reasons why a verdict should have been directed in their favor. None of said reasons require any extended consideration, for we are convinced that the special verdict of the jury disposed of most of them; it certainly disposed of the question of the negligence of the defendants, and the contributory negligence of the plaintiff. A mere reading of the special verdict will disclose this fact.

There is one matter which is claimed as a reason why the verdict should be directed in favor of the defendants. This refers to the two

methods of performing the work in question,—one claimed to be safe, and the other unsafe,—it further appearing that the plaintiff took that method claimed by the defendants to be unsafe.

We think the court was not in error in refusing to direct a verdict in defendants' favor, on the claim that the plaintiff, in doing the work in question whereby he was injured, had the choice of an option of two methods in performing the work,—one safe, and the other unsafe.

We are of the opinion that the testimony does not show that one method was safe and the other unsafe, but that it does show that both methods were safe, when it is considered, as the plaintiff had a right to consider and believe, that the current contained in that house, and in the wires which he was about to repair, did not exceed 110 volts. His testimony shows that, if he had turned off the current of electricity by use of the switch on the second floor, the injury could not have occurred.

His testimony also shows that, if the wires contained no more than 110 volts, which they were supposed to contain, and which, with his experience, he had reason to believe they did contain, the procuring and standing upon a dry pine board while making the repairs would, under such conditions, be a perfectly safe way to proceed, and, in this case, it would have, no doubt, been a perfectly safe way in which to proceed had it not been for the negligent acts of the defendants, which were, in fact, the grossest kind of carelessness and negligence, in leaving the two primary wires lying loosely upon the upper crossarm, and in no manner insulated, so that, when the secondary wire which passed from the second crossarm upward and near these wires, and then led off to the left and north, as above stated, it came very near, or possibly in contact with, such primary wires, and received from them the voltage which they contained, which was 2,300.

If the two primary wires in question had been properly insulated, the injury could not have occurred. The defendants were grossly negligent in failing to properly insulate those two wires, and such gross negligence is the proximate and primary cause of the plaintiff's injuries, and, had it not been for such negligence on the part of the defendants, there would have been only 110 volts in the wires in the basement in question, instead of 2,300 or possibly more.

The use of the pine board, according to the testimony of the plaintiff, would have been a safe method to have used while making such repairs. If the use of the pine board, upon which plaintiff stood while making the repairs, was not a safe method, it was made unsafe by the gross negligence of the defendants, of which the plaintiff had no knowledge.

The court was not in error in overruling the objections of the defendants, relative to a special verdict, on the ground that it did not contain all of the issues to be submitted, and on the further ground that the questions, in part, were not questions relative to the ultimate facts, but were legal conclusions; and that the specific questions, relative to the liability of either or both the defendants, were entirely omitted from the questions, and many other and further objections interposed by the defendants, to the special verdict,—all of which were, by the court, overruled, and we think, properly. We think the questions stated by the court in the special verdict fairly covered the matters involved in the merits of the case.

While the provisions of § 7633 provide that the special verdict shall be prepared by the court in the form of questions in writing, etc., this does not mean that the attorneys and counsel connected with the case have no duty to perform. They are officers of the court, whose duty it is to assist it. If, then, there were any material matter which the attorneys, or any of them, considered involved the merits or material matter of the case, it would seem it would be their duty to draw the attention of the court to such a matter, and to make an effort to have it incorporated in a question to be submitted by the court.

Under such circumstances, the counsel cannot sit quietly by, believing that some material matter should be incorporated into a question and, by the court, presented, and permit the court to fail to submit such matter in the special verdict, by a special question covering the matter, and then afterward, when it is too late for the court to correct such matter, claim that the court has committed error.

In such case, such error should generally be considered harmless, and the party claiming benefit, by reason of the court's failure to include the matter complained of in such question, should be considered to have waived the same.

Courts and juries were organized and came into existence as a means

44 N. D.—5.

of determining the rights of parties invoking their powers, and, when rights are being determined thereby, the counsel of the litigants are in duty bound not only to those whom they represent, and whose cause they champion, but to the court, to use every effort to assist it in bringing before it every matter material to the controversy, to the end that, in that trial, there may be a final determination of all issuable matter, so far as that court is concerned.

We have examined at a considerable length the instructions of law as given by the court, with reference to each of the questions submitted, and find therein no reversible error. As a whole, they were fair to the defendants, and, in some respects, were much more favorable to them than they could have hoped for.

The court properly submitted each of the special questions to the jury. There were none that should not have been submitted, and, as submitted, they embraced the merits of the case.

The seven specifications of the insufficiency of the evidence to sustain the verdict are without merit. The evidence is quite sufficient to sustain the verdict. It is also quite sufficient to establish the negligence of the defendants, and to establish that the plaintiff was not guilty of any contributory negligence.

The questions of negligence of defendants, the contributory negligence, and the assumption of risk, if any, by the plaintiff, were, by proper questions, included in the special verdict. Each were questions of fact for the jury. It decided them in the manner shown by the special verdict. There is nothing more that need be, or really can be, said with reference to these questions. They have been decided by the jury, and their special verdict disposes of these questions.

There is nothing in the record to show that the verdict of the jury was rendered under the influence of passion and prejudice. Where a verdict of a jury is sought to be set aside, on the grounds of passion and prejudice, there should be something to show that it was actuated by passion or prejudice. It must not be a mere imaginary condition.

The passion and prejudice complained of must not be a mere conclusion. It would seem, before it could reasonably be maintained that a verdict is the result of passion and prejudice on the part of the jury, there should be some fact, circumstance, incident, or action presented to and before the jury, which should not have been presented,

or, if it should have been presented, was presented in such an unwarranted, unlawful, and prejudicial manner as to likely cause bias and prejudice to arise in the mind of the jury.

However, under any view, it is absolutely clear there was no bias and prejudice on the part of the jury in this case. There was no error in the court denying the motion of the defendants for a dismissal of the action as to James Rheinfrank. The special verdict finds that both the defendants were negligent, and that finding is sufficiently supported by the evidence. Neither was it error for the court to refuse to dismiss the action as to both the defendants.

The court was not in error in granting the plaintiff's motion during the course of the trial, in which the plaintiff abandoned any claim based upon the negligence of the defendants in failing to properly ground the secondary wire used in connection with the furnishing of light to the houses in question, and, hereinbefore mentioned, the evidence not showing the manner in which the secondary wire was grounded, but being confined principally to the fact as to what constitutes proper grounding. Part of the same motion abandoning any claim of recovery by reason of want of proper inspection of the wires by the defendants, and also as to plaintiff's right to recover solely on the claim of want of due diligence, after receiving notice of the trouble in the Kellington home on the day of the injury, was properly granted, for the principal issues in the case were those which were included in the special verdict. We have examined all the other errors assigned, and conclude that the court has committed no reversible error.

The eleven questions were properly submitted by the court to the jury, in the special verdict. There were none of such questions improperly submitted to the jury.

In this case, the defendants had the opportunity and benefit of two extended trials before the trial court, and the benefit of a jury at each trial. There is every reason to believe, from the state of the record, that each of those trials were fair and impartial.

The defendants appealed to this court from the first judgment rendered against them, and it was reversed on account of erroneous instructions of the trial court. The case has been retried, and a slightly increased verdict returned in favor of plaintiff. There being no error

in the record on appeal, there is no reason why the judgment should not be affirmed.

The judgment is affirmed.

The respondent is entitled to his statutory costs and disbursements on appeal.

BIRDZELL and BRONSON, JJ., concur.

CHRISTIANSON, Ch. J. (concurring specially). On a former appeal I expressed the views that the questions of negligence and contributory negligence were for the jury. I also stated that I was of the opinion that it could not be said as a matter of law that a verdict for $14,759.99 was excessive. 41 N. D. 137, 170 N. W. 312. These views are equally applicable on this appeal. With respect to the special verdict I am of the opinion that it covers the material, controverted points in the case; and that the facts found by the jury thereon entitle plaintiff to judgment against the defendants for the amount specified in the verdict. For these reasons do I concur in an affirmance of the judgment.

ROBINSON, J. (dissenting). This is a personal injury suit in which, for the second time, defendants appeal from a verdict and judgment for $15,000. 41 N. D. 137, 170 N. W. 312. As stated in the former appeal, the complaint avers, and it is true, that in July, 1916, at New Rockford, North Dakota, defendant corporation owned and operated an electric light and power plant, and furnished electricity and light and power in the city of New Rockford, and at the residence of one W. J. Payne; also that the defendant James Rheinfrank was in charge of and had the control and management of the plant; that the plaintiff was an expert electrician in the employ of one Beaudry, and, in the line of his special business, at the direction of his employer, at the residence of Payne, he undertook to repair an electric light wire that had been burned and severed during a severe electrical storm. For that purpose, with an assistant, he went into the cellar of the Paine building, and found the electric wire burned and severed, with the two ends dangling. For protection he stood on a board, and then took hold of one end of the wire, and at the same time he, by some inadvertence, put his head in contact or close proximity to a grounded iron

pipe so as to complete the electric current. Instantly the blue electric flames played between his head and the pipe, and held him fast until his helper ran upstairs, pulled the switch and shut off the electric current. For two weeks the plaintiff was confined to his bed. Then he passed six months in a state of convalescence and commenced to work at $50 a month. Then, in six months, his wage rate was $75 a month; then, $85 a month, then $90 and then $100. At the hazardous electrical work the salary of the plaintiff amounted to about $140 a month. He suffered from some burns on his left hand and on the crown of his head and other parts of his body, and from nervous shock and several incidental burns. His greatest loss was an injury to his right hand. He lost the ring finger, which had to be amputated, and, in part, the use of the other fingers by reason of the fact that, in healing, the fingers were permitted to grow together, with a new tissue flexing and bending them down to the palm of the hand.

On the former appeal one judge held that the verdict was excessive, and all the judges agreed on a reversal because of errors of law occurring at the trial.

The case presented is one of negligence and contributory negligence. The accident would not have happened if the primary and secondary wires leading to the Payne house had been properly fastened so as to prevent them from coming together. It would not have happened if the plaintiff had pulled the electric switch at the Payne house and shut off the current before going into the cellar,—and possibly it would not have happened had it not been for the severe electrical storm. There was a safe way and an unsafe way of doing the business, and no one knew that as well as the expert, and with such knowledge he chose to do it in the unsafe way. Of course he did not intend to incur any danger; he did not know the effect of the severe electrical storm in causing the primary and secondary wires to run together and throw all the electric current onto the cellar wires. However, it was manifest that the current had burned and severed the wires. Plainly this is a case where the loss should be apportioned between the plaintiff and the defendant, as they were both negligent. The jury found a special verdict in answer to several questions; they found that the sum necessary to compensate the plaintiff for his damage was $15,000. Though the questions are so framed as to elicit answers in favor of plaintiff,

defendant's counsel has no good reason to complain, because he did not draft and submit proper questions as requested by the court. He said to the court: I am just making all the objections I can think of. It seems his purpose was not to aid the court, but to gain a reversal by some nice practice, and such practice is not to be commended by considering any of his objections. However, the record shows negligence on the part of both the plaintiff and the defendant, and it does show that plaintiff's own negligence, or rather his lack of clear perception and presence of mind, was the proximate cause of his injury. He went into the cellar, knowing that a severe electrical storm had just occurred, and that by the excessive electric current the cellar wires had been burned and severed, and, with his bare hands, he took hold of them and inadvertently put his head against the grounded iron wire, and that was the direct and proximate cause of his injury. However, according to modern thought, he should not bear all the loss, because it is in no way possible for an ordinary man at all times to preserve his presence of mind, and to contemplate and guard against all hazards and accidents; and it is fair to presume that in doing the business it was not the purpose of the plaintiff to incur any risk or hazard. Hence, his injury was a pure accident.

At the date of the accident the plaintiff had thirty-one years; he had still thirty years of good working capacity. His actual pecuniary loss has been about $600 a year. In fairness the defendant should pay a sum sufficient to purchase for the plaintiff a life or thirty-year annuity of $600; $15,000 is excessive, because interest on that sum would be a thousand a year; $15,000 would buy a life annuity of $1,200.

The suit was brought for $15,000, so that by skill and artifice the counsel might obtain for themselves $7,500, without enduring any pain or loss or suffering, and of course common honesty would forbid them to exact such a share if they thought the plaintiff entitled to receive $15,000. At the commencement of the action the counsel unjustly served notice, claiming a lien for $7,500, and thus their excessive claims have barred the defendant from making a just settlement with the plaintiff. The attorney's lien given by statute is for money due in the hands of the adverse party. § 6875. When money is due, the law implies a contract to pay it, and it may be recovered in an action of assumpsit But surely in case of assault and battery, libel, false impris-

onment, and personal injury, the law does not imply a promise to pay. The cause of action is not a debt, and it may not be assigned or mortgaged or liened. In the Greenleaf Case the majority decision was not well considered; it is erroneous. 30 N. D. 115, 151 N. W. 879, Ann. Cas. 1917D, 908. The statute permits an attorney to make a reasonable and fair contract in regard to his fees, but it does not permit him to exact or contract for an unreasonable fee. That is simply piratical, and the court may and should forbid any extortion by its officers. In this case the contract fee should not have exceeded $1,000. As the counsel for defendant refused to obey the orders of the court by preparing the questions for submission to the jury, it would serve him right to affirm the judgment. If he had submitted proper questions, there might have been no necessity for an appeal. It is in no way probable that the jury intended to find a verdict giving the attorneys $7,500 and the plaintiff $7,500.

This has been a vexatious and protracted suit, which should be settled without further delays and expense. The defendant should be permitted to settle the case for such sum as the plaintiff may accept, and to settle the attorneys' fees by paying to the clerk of the court for them a sum not exceeding $1,000. Neither party should recover any costs on this appeal.