## INTERSTATE POWER CO. v. THOMAS.

### No. 9033.

Circuit Court of Appeals, Eighth Circuit.
Aug. 11, 1931.

Charles H. Weyl, of St. Paul, Minn. (Briggs, Weyl & Briggs, of St. Paul, Minn., on the brief), for appellant.

A. A. Trost, of Warren, Minn., for appellee.

Before KENYON and BOOTH, Circuit Judges, and OTIS, District Judge.

KENYON, Circuit Judge.

This is an appeal from a judgment of the District Court of the United States for the District of Minnesota in an action brought by O. W. Thomas, appellee, against Interstate Power Company, appellant, for damages for personal injury caused by an electric shock to the said Thomas from appellant's power line.

Parties will be designated as in the trial court.

The facts are as follows: Plaintiff was a farmer, who for twenty-four years previous to the accident had lived on a farm four miles south of Warren, Minn. Minnesota highway No. 6 passed the farm in a north and south direction, the farm being on the west side thereof. Defendant is in the business of furnishing electric power, and maintains a main electric line along the west side of

said highway No. 6, which carries a current of 22,000 volts. Defendant had an insulated wire from this to his house, which had a voltage of 110 volts. About one-half mile north of where plaintiff lived there is an intersecting east and west road to highway No. 6. On the north side of this road defendant maintained on poles three hundred feet apart an insulated electric wire carrying 2,300 volts, which served the Torgerson farm and none other. Between the Torgerson farm and highway No. 6, and about one-half mile from said highway and practically midway between the poles supporting the wire, there is a public road running in a northerly direction past the Fisher farm and continuing north about four miles until it intersects the main road easterly from the town of Warren. Plaintiff at the time of the accident was with Fisher and one Kayes, owner of an Aultman-Taylor separator and a Rumley engine. The elevator on the separator was fourteen feet long. The lowest part one foot and seven inches from the ground. There was an iron rod coming out of the top of the separator, bolted to it with set screws. The elevator was made of wood on the outside and lined with steel or tin on the inside. The weigher on top was made of heavy tin and iron. September 23, 1927, plaintiff was moving this separator from the Edgar farm east of the Torgerson farm to the Fisher farm. The separator, the wheels of which were of metal, was set up and was being moved with a tractor. Attached behind the separator was a tank containing the gas and water for the tractor. The tractor was used for threshing and for moving the machine, but could be detached. After going west and passing the Torgerson farm plaintiff turned to the north at the road to the Fisher farm. It was necessary to pass under the electric wire running along the north side of the east and west highway from the main line on highway No. 6 to the Torgerson farm. This north and south road running by the Fisher farm was not graded as was the east and west road which made the latter somewhat higher than the Fisher road, so that in passing from the east and west road on to the Fisher road there was a descending grade. After plaintiff had reached the north road with the separator and the tractor and was passing under the electric wire he looked back from his seat on the tractor and saw that the wire would catch the elevator on the separator. He stopped the tractor, went back to the separator and examined the situation. The wire was about seven inches down from the top of the elevator and was touching it. He did not back up because of the grade from the east and west road and because of the oil tank and the feeling that to back up would smash his blower. After studying the dilemma he was in he felt of one of the wheels of the separator to make sure it was not charged with electricity. He decided to try and get the wire loose from the elevator and he intended to take a ladder he had with him five or six feet in height and use it to pry the wire from the separator and over it, and then drive on. He stepped on the axle with his right foot and on top of the wheel with his left foot. When he took hold of the iron rod which came from the top of the separator to assist himself in getting on to the separator he received the shock which resulted in his injuries. He could not loosen his hands, and the next he knew he was in the hospital at Warren. There was a mark on the elevator where the wire had touched it, which gave the appearance of a burn. This was not discovered until after the accident.

At the close of the testimony defendant moved the court for an instructed verdict upon the grounds that the evidence failed to show any actionable negligence, and that plaintiff was guilty of contributory negligence as a matter of law. The court denied the motion, the case was submitted to the jury, which returned a verdict for plaintiff.

A motion for judgment notwithstanding the verdict was denied, and a motion for new trial was overruled.

Two propositions are urged on this appeal, both preserved by proper motion in the trial court: (1) That plaintiff did not show any actionable negligence on the part of defendant; (2) that plaintiff was guilty of contributory negligence as a matter of law.

On the issue of defendant's negligence, the court instructed the jury as follows:

"It is the duty of a power company to use reasonable care to keep its lines at a height which will not interfere with the customary use of the highway for travel. If it fails to use care in that regard, it is negligent. If a road is used for transportation of high machinery, the company must recognize that fact and in placing its wires across such road, must place them high enough not to obstruct it. The company must also use reasonable care to prevent its wires from sagging so as to become dangerous to those travelling the highway. Reasonable care in transporting high voltage over wires means a high degree of precaution, a degree of care equal or com-

mensurate to the risk involved. Failure of a power company to anticipate and guard against events which may reasonably be expected to happen, is negligence, but failure happening which would not have arisen except under exceptional or unusual circumstances, is not negligence. * * *

"If, from a fair preponderance of the evidence or overweight of the testimony, you find that the Power Company, in the exercise of due care, should have anticipated that this power wire would sag to a point over this road, so as to come into contact with a vehicle such as this separator was, and that this highway was one which it was reasonable to suppose would be used by such vehicles, and that the Company should, in the exercise of reasonable care, have taken precautions other than such as the evidence shows were taken to prevent such sagging, either by putting in a pole or taking some other precaution, then you could find that the Power Company was negligent. Unless you do find that the Power Company was negligent in that regard, you will bring in a verdict in favor of the Company, and that will end this case."

The failure to give warning at the point where the accident happened was held by the court to be no basis for a finding of negligence, assuming that as originally constructed the line was high enough so as not to be dangerous.

Plaintiff claims that defendant was negligent in constructing and maintaining an uninsulated wire containing a voltage of 2,300 volts in such manner that it sagged until it was less than sixteen feet from the surface of a public highway; that it should have placed its poles closer to the highway and thus have avoided the dangerous sag at the point where the road passed under the wire. Power companies are by statute given certain rights on Minnesota highways.

Section 7536, General Statutes of Minnesota, 1923, is as follows: "Use of public roads—Restriction—Any water power, telegraph, telephone, pneumatic tube, or * * * light, heat or power company may use public roads for the purpose of constructing, using, operating, and maintaining lines, subways, canals, or conduits, for their business, but such lines shall be so located as in no way to interfere with the safety and convenience of ordinary travel along or over the same; and in the construction and maintenance of such line, subway, canal or conduit the company shall be subject to all reasonable regulations imposed by the govern-

ing body of any town, village or city in which such public road may be. Nothing herein shall be construed to grant to any person any rights for the maintenance of a telegraph, telephone, pneumatic tube, light, heat or power system within the corporate limits of any city or village until such person shall have obtained the right to maintain such system within such city or village, or for a period beyond that for which the right to operate such system is granted by such city or village." R. L. § 2927, amended 1911, c. 57, § 1.

Power lines under the Minnesota statutes must be located in such way on the public roads as not to interfere with the safety and convenience of ordinary travel along or over the same. No new standard of care is set up. The Minnesota law applicable is well expressed in Bunten v. Eastern Minnesota Power Co., 178 Minn. 604, 228 N. W. 332, 333, where the court said: "Those engaged in transmitting such a dangerous force as electricity, which gives no warning of its presence and is not apparent to the senses, are required to exercise a degree of care in constructing and maintaining the wires over which it is transmitted commensurate with the danger to be apprehended from contact with such wires or the escape of electricity therefrom; but they are not insurers against accidents or injuries. * * * It has also been held negligent to fail to maintain such wires at a sufficient height above a highway to permit the unobstructed passage of structures of a height frequently moved along the highway." Joyce on Electric Law, par. 445, states the general rule as follows: "A company maintaining electric wires over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have a right to go, either for work, business, or pleasure, to prevent injury." See, also, as to degree of care required in transmitting electric fluid, Dierks Lumber & Coal Co. v. Brown (C. C. A.) 19 F.(2d) 732; Reynolds v. Iowa Southern Utilities Co. (C. C. A.) 21 F.(2d) 958.

Was the moving of the separator with an elevator fourteen feet long (which was not an unusual height) fully set up, the lowest part being one foot and seven inches from the ground, such unusual and extraordinary use of the public highway that the defendant was under no obligation in placing its wires across such highway to anticipate such travel? While defendant under the law

of Minnesota had the right to transmit the dangerous electric fluid along the highway, it was required to exercise a high degree of diligence to protect those who could be reasonably expected to be lawfully upon such highway. Defendant argues that the hauling of this separator fully set up was not ordinary travel on this particular highway and was not reasonably to have been expected. It is urged that the evidence shows this to be the only separator in the vicinity, and that the nearest farmer owning a separator was Gilbert Arhaug, who lived nine miles from the accident. We think this statement is not borne out by the evidence.

■ Mr. Thomas testified, "There are several similar separators in that locality." He also testified that in moving the separator set up as it was he was proceeding according to the general custom, and that in that section of the country there was mostly grain farming. It would seem that in a grain country separators were to be expected on the highways, and, if it was the general custom to move them fully set up, as testified to by Thomas, then such moving would be embraced in the term "ordinary travel." The testimony as to Gilbert Arhaug and his separator tends to sustain the proposition that there were similar separators in that locality, because the testimony is that sometimes he did not bring the separator from his farm, but hired some outfit to do that work for him. The Arhaug machine was larger than the Thomas separator.

In Edison Electric Light & Power Co. v. Blomquist, 110 Minn. 163, 124 N. W. 969, 125 N. W. 895, 136 Am. St. Rep. 460, and in Collar v. Bingham Lake Rural Telephone Co., 132 Minn. 110, 155 N. W. 1075, L. R. A. 1916C, 1249, the Supreme Court of Minnesota held the moving of a house along a highway did not constitute ordinary travel. Highways are not primarily constructed for the purpose of moving houses thereon; however, if houses were frequently and customarily moved along a highway, a different question would be presented. The Supreme Court of Kansas in Logan v. Empire Dist. Electric Co., 99 Kan. 381, 161 P. 659, L. R. A. 1917E, 258, held that it was a question of fact for the jury whether the defendant should not have anticipated the use of the highway in moving buildings thereon, and that evidence was admissible to show the extent to which the highway had been used for moving buildings, machinery, and other high structures. There was evidence to show common use of the highway in moving build-

ings such as should bring notice to the defendant that its high voltage wires were a menace to human life unless sufficient precautions were taken to elevate the wires to the extent they would not interfere with the lawful use of the highway. In the case of Shank v. Great Shoshone & Twin Falls Water Power Co. (C. C. A.) 205 F. 833, 837, plaintiff was moving a hay-stacker along the highway and came in contact with defendant's wire which was twenty-seven feet and three inches from the ground, and the court said: "What was the duty of the defendant to the plaintiff under the circumstances disclosed by this evidence? It was clearly its duty to have used every reasonable precaution to raise and keep its high power transmission wires sufficiently high above ground for the safe passage of such structures as the plaintiff was engaged in moving at the time and at the place he was injured. Such structures were common to that locality. It was not of unusual height and its passage along the highway and over the bridge was to be expected at any time." In Neumann v. Interstate Power Co., 179 Minn. 46, 228 N. W. 342, it was contended that defendant was not compelled to anticipate the handling of a twenty-foot iron pipe which had come in contact with one of the high voltage wires of defendant resulting in death to two workmen having hold of the pipe. It was held, however, that the question was for the jury. In Greenwood v. Eastern Oregon Power Co., 67 Or. 433, 136 P. 336, 339, plaintiff's hay derrick came in contact with electric wires strung by the power company over a highway. The negligence charged against the company was allowing its wires to be maintained as low as they were over the highway. The court said that the evidence tends to show that derricks of the same character were common in that country, and that "it was the duty of defendant to have used care commensurate with the extremely dangerous character of the force it was engaged in transmitting in maintaining its wires at crossings as to minimize their danger to citizens lawfully using the public roads."

■ It appears that at the time of the accident here in question the wire had sagged about four feet at a point where the north road turned off from the east and west road. The poles supporting the wire were twenty-five feet long, and five feet were under the ground. They were three hundred feet apart and the road was at just about the center of this distance. The day before the accident plaintiff had moved the same thresh-

ing outfit under this same wire without trouble. The difference in the sagging is accounted for by the difference in temperature. The day before when he went under the same wire at about 6 o'clock in the morning, just at daybreak, it was quite cool and rather frosty. The day of the accident the weather was hot and dry, and it was about half-past twelve when he attempted to go under the wire. The poles and wire looked the same as they always had. That a wire will contract in cold weather and expand in hot weather is a matter of which a court will take judicial notice. Lickfett v. Jorgenson et al., 179 Minn. 321, 229 N. W. 138. The effect of temperature is referred to in Gilbert et al. v. Duluth General Electric Co., 93 Minn. 99, 100 N. W. 653, 654, 106 Am. St. Rep. 430, where the court said: "It appears from the record that electric wires are ordinarily hung with a slack of 5 inches for every 100 feet, for the purpose of allowing for changes in temperature. The weight of evidence indicates that 1 inch of slack in a wire will produce 4 inches of sag between poles 100 feet apart. These wires were strung by appellant 16 inches apart upon a single cross-arm. The evidence offered was conflicting, but tended to show the sag at the point of contact to be from two to four feet. There was sufficient sag so that the primary wire swung under and looped back over the secondary wire. It is conceded that the weight of the wire gradually increases the sag, and requires that such wires be shortened from time to time. A rising temperature increases the length of wire, and, conversely, cold shortens it. For this reason a slack of 4 or 5 inches is necessary between posts 100 feet apart." Defendant's experts would know better than any theorist the effect of temperature upon wires and would of necessity take that into account in stringing its wires over public highways.

■■ Without extending the discussion further, we may say that we think that part of the charge of the court which we have heretofore set out relative to the negligence of the power company was correct.

■■ In passing on the motion for new trial the court said: "I was of the opinion, when I tried this case, that, even in the absence of evidence that careful construction required the placing of poles close to a highway, a jury might find that, in the exercise of the high degree of care which a company transmitting high voltage electricity must exercise, it was the duty of the defendant to anticipate and prevent the sagging of the wire over the road in question by putting in an additional pole near the road. It seems to me that on that question reasonable men might differ and that it could not properly be said, as a matter of law, that there was no negligence in failing to take that precaution." With this statement we agree.

Whether or not it was the duty of the defendant, in exercising that diligence it was required to use in preventing the sagging of its uninsulated wires over a public highway to a point dangerous to lawful travel thereon, to have put in an additional pole close to the north and south road, or to have used other precautions, and whether or not the moving of a separator with an elevator fully set up constituted such ordinary travel upon the highway as was to be reasonably anticipated, are both questions of fact for the jury to determine.

■ We pass to the question of contributory negligence. Plaintiff undoubtedly had that nebulous knowledge of electricity that the average farmer has. He had made no study of the subject, nor read anything concerning it. He had some general knowledge of what voltage meant. He had an insulated wire to his own home from a pole on the highway on the main line which carried 110 volts; he knew of the cylindrical tanks or transformers on the poles which cut down the higher voltage so the electricity could pass into the various houses safely; he knew that the Torgerson house was the only one to tap the line on the east and west road, that the voltage into his own house was not dangerous, that "it bit you a little." He thought the voltage on the wire to the Torgerson house was the same as on his wire, and that there was no danger of any shock in a wire carrying 110 volts. The wires looked alike. He did not know the wire he was passing under carried a voltage of 2,300 volts and was not insulated. He testified, "it was a thick wire, looked like a rubber insulated." He was going down a grade and could not back up without considerable difficulty and injury to his straw blower. The fact of feeling the wheel showed some apprehension as to the situation, but he did not have understanding knowledge of the danger incident to the manner in which he was arranging to lift the wire over the elevator.

In Stuhr v. Wright County Telephone Co., 119 Minn. 508, 138 N. W. 693, plaintiff was driving a threshing outfit on a public highway in Minnesota and the smokestack of the engine came in contact with defendant's wires suspended over the highway.

He went forward to investigate the situation, when the wires broke loose, throwing him down and injuring him. Damages were sought to be recovered because of the alleged negligence of defendant in maintaining its wires so low over the highway as to obstruct and endanger travel thereon. The defense was contributory negligence, the theory of defendant being that when plaintiff stopped his engine which was against the wires he went forward from a place of safety to one of danger to investigate their condition; that he fully appreciated the hazard of the situation. The court held that plaintiff was not guilty of contributory negligence as a matter of law.

In Wade v. Empire Dist. Electric Co., 98 Kan. 366, 158 P. 28, Wade was killed while engaged in moving a derrick along a highway, the same coming in contact with electric wires belonging to the defendant. The derrick was twenty feet high and about twelve feet square. The derrick was stopped before the wires were reached and Wade went up to lift the wires. He received a shock resulting in his death. The court held that Wade was not guilty of contributory negligence as a matter of law. The jury found in answer to a special interrogatory that the deceased could have moved the derrick under the wire by lowering it and hauling it in a horizontal position, and it was contended that deceased therefore was guilty of contributory negligence as a matter of law because he failed to adopt the safe method, but the court was unwilling to hold him guilty of contributory negligence. See York v. General Utility Corp. et al., 44 N. D. 51, 176 N. W. 352; Shank v. Great Shoshone & Twin Falls Water Power Co. (C. C. A.) 205 F. 833.

Could not a reasonable man under all the circumstances take into consideration, in determining what to do, the fact that the wire looked the same as the one to his house which carried only 110 volts and was insulated and not dangerous? No rule could be laid down as to what an ordinary prudent person would do in the situation presented to plaintiff. Subsequent developments show he did the unwise thing. The trial court in passing on the motion for new trial discussed the situation as follows: "My own impression is that what Mr. Thomas did was an imprudent thing; that he took unwarranted chances; that he selected a way of extracting himself from a difficulty which involved unnecessary risk; but I did not think that what he did was so conclusively negligent as to justify me in withholding the case from the jury. Had Mr. Thomas been dealing with a situation involving dangers and hazards with which all of us are familiar and had he selected an obviously hazardous way out of his trouble, when there was a safe way, there would have been no doubt as to his carelessness."

When a court assumes to say that reasonable men in exercising their fair and impartial judgment could not differ on a question of fact such as is here presented, it should be very sure of its ground. A layman's opinion on a question of fact may be fully as reasonable as a court's opinion. Where reasonable men may fairly differ in their conclusions from the evidence as to a question of fact, the solution thereof is for the jury. As to whether plaintiff acted as a reasonably prudent man under all the circumstances is a question on which a sharp diversity of opinion might well exist. To have held here as a matter of law that plaintiff was guilty of contributory negligence would in our judgment have usurped the province of the jury, and the trial court was right in not so holding. In Cary Brothers & Hannon v. Morrison, 129 F. 177, 181, 65 L. R. A. 659, this court said: "The question of contributory negligence, like every question of negligence, is ordinarily for the jury; and it is only when there is no substantial conflict in the evidence which conditions it, and when, from the undisputed facts, all reasonable men, in the exercise of a fair judgment, would be compelled to reach the same conclusion, that the court may lawfully withdraw it from them." Mutual Life Ins. Co. of N. Y. v. Hatten (C. C. A.) 17 F.(2d) 889; United States Can Co. v. Ryan (C. C. A.) 39 F.(2d) 445; Skaggs Safeway Stores, Inc., v. Dunkle (C. C. A.) 49 F.(2d) 169.

We think the court did not err in submitting both the question of defendant's negligence and plaintiff's contributory negligence to the jury as matters of fact for them to determine.

The judgment is affirmed.