# CHARLESTON.

THORNBURG v. CITY AND ELM GROVE RAILROAD CO.

Submitted January 26, 1909.    Decided March 23, 1909.

1. ELECTRICITY—*Care Required of Electric Companies—Contributory Negligence.*
   The rules and principles announced in *Thomas* v *Wheeling Electrical Co.*, 54 W. Va. 395, respecting the duties of electric companies, and the care required of them in keeping their dangerous wires perfectly insulated at places where people have the right to go for work, business or for pleasure and their liability for negligence therein considered approved and applied. (p. 382.)

2. SAME—*Action—Question for Jury—Negligence.*
   Ordinarily the question whether that degree of care required in the construction, inspection and repair of wires carrying highly dangerous currents of electricity has been observed in a given case is one for the jury. (p. 384.)

3. SAME—*Contributory Negligence.*
   And generally the question of contributory negligence of one injured by coming in contact with such wires is one also for the jury. (p. 384.)

Error to Circuit Court, Ohio County.

Action by D. S. Thornburg, administrator of Ezra I. Blosser, deceased, against the City & Elm Grove Railroad Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

RUSSELL & RUSSELL, for plaintiff in error.

JOSEPH HANDLAN, for defendant in error.

MILLER, PRESIDENT:

This is an action by plaintiff, as administrator of Ezra I. Blosser, deceased, a boy of fourteen years, against defendant to recover damages for the death of deceased, the result of his coming in contact with a primary wire of defendant, heavily charged with electricity, suspended over Little Wheeling Creek, in Ohio county, and along and near to the National Pike, and the stone arched bridge over said creek, and over which bridge, on the evening of January 7, 1907, the deceased with his mother, the janitress of a school house near by, and her two little girls, one

nine and the other seven years of age, were passing on their way home from the school house. A side wall three feet high and two feet wide, with coping on the top, and beveled or tapering off at each side, but leaving a level surface about fourteen inches wide, guarded each side of the bridge. The top of this coping was constantly used by school children and others as a walk in crossing the bridge, although there was a side walk four feet wide on the inside and along the wall built over the bridge. The top of the coping had been so used, and used so long in this way, as to have become much worn by the feet. On one side of the bridge, at about the top of the arch, where deceased was killed there was a lamp or gas post with a bearing on the arch outside of and fastened to the wall and coping, bearing a gas pipe bent over the walk, with a lamp attached, to give light on the bridge. Besides the wire with which deceased came in contact there was a second primary wire charged with the same voltage, also a signal wire carrying a lighter current of electricity. The two primary wires were suspended from horizontal brackets on poles set at each end of the bridge, and on the same side as the gas post, but the signal wire was fastened to small upright brackets attached to the poles some twelve to thirteen inches below the horizontal brackets. These wires opposite the lamp post hung so low and close to the bridge that a boy of the height of young Blosser, standing on the coping of the wall could, as some witnesses say, reach out and touch the first primary wire and the signal wire, but as others say, they could be reached only by putting one arm around the lamp post and reaching out in the direction of the wires with the other. The mother says that at the time her son was killed the inside primary wire was sagging down a few inches below the signal wire, and could easily be reached by one standing on the coping at the lamp post, without any support from it; and in this she is supported to some extent by some of the other witnesses, who were at the place either a few minutes after Blosser was killed, or early the next morning. U. M. Hervey, president of the school board, a witness for plaintiff, who was there the following morning says, on cross-examination, that a person could stand on the coping and reach either of the wires. Counsel endeavored to have him say that these wires could be reached only by swinging out from the post, as already indicated, but the

nearest he came to it was to say, with reference to the fatal primary wire, that it could easily be reached in that way "and it might be reached with safety without that.. I wouldn't want to say yes or no." Another witness, R. H. Walter, who saw the wire sagging made some measurements with his ruler that evening; he could not say he measured accurately for he was afraid to get too close to the wires, but as near as he could tell, the wire was 'between four and five feet from the wall, measuring as he said on cross-examination diagonally across from the top of the wall to the wire. He did not measure horizontally out from the post to the wire. Witnesses for the defendant who testified that they made accurate measurements the following morning say that measuring vertically the inside primary wire hung six feet and ten inches, and the signal wire five feet and nine inches from the top of the coping; and that measured horizontally out the primary wire was three feet and one and one fourth inches from the post. The fact is, however, that young Blosser who just before his death was seen by his mother walking on the top of the coping and almost instantly afterwards when she looked up she found him standing upright on the top of the wall with the first three fingers of his right hand clutched under and around the inside primary wire, and, as she says, his head bent back, his knee slightly bent, and his hair standing out and waiving as if the wind was blowing through it; and that when she caught hold of his coat and pulled him he fell over unconscious on the side walk, and was dead. She did not see him, and no one seems to have seen him at the moment when he caught hold of the wire. The mother, the only witness who testified as to the boy's height, says his height was five feet seven inches. All witnesses agree that the insulation of the wire, which did the deadly work, was worn off and hung down in shreds so as to furnish little, if any, protection to one coming in contact with it.

The jury found a verdict for the plaintiff, and the court below pronounced judgment thereon for $3,500.00, and defendant brings error. Is the defendant liable? The defendant denies liability on two grounds: First, that the deadly wire was not in a place where it owed deceased any duty to keep it insulated and in good repair; and, second, because Blosser was guilty of contributory negligence in reaching out in the manner described and touching the wire. Appertaining to these questions

the jury responded to three interrogatories, submitted by the defendant, as follows: Number one: "Was the wire which caused the death of Ezra I. Blosser in such a position that children or other persons may reasonably have been expected to come in contact with it?" Answer, "Yes." Number two: "Was the manner in which Ezra I. Blosser acted in coming into contact with the wire negligent, taking into account his age and the circumstances surrounding him at that time?" Answer, "No." Number three: "Could Ezra I. Blosser while walking along the stone wall have unintentionally come in contact with the wire which caused his death?" Answer, "Yes." It is claimed that the answer to the last interrogatory was not supported by any evidence; that the manner in which the deceased was shown to have had hold of the wire shows conclusively that he had not taken hold of it to save himself from a fall, because in falling he would naturally have taken an over hold and not an under hold of the wire, and that inasmuch as he was found with his left arm around the post and the fingers of his right hand on the wire and thus supported by the post he must necessarily have reached out and intentionally and negligently taken hold of the wire, and thereby by his negligence contributed to his death. But assuming the fact to be as claimed we do not think the answer of the jury to this interrogatory destructive of their general verdict.

On the first proposition this Court in *Thomas* v. *Wheeling Electrical Co.*, 54 W. Va. 395, in accordance with the decisions of many other states, has held it to be "the duty of electric companies to use very great care to keep the insulation of its dangerous wires perfect at places where people have the right to go for work, for business or for pleasure;" and that "when injury to a person comes from contact with a live electric wire from bad insulation at a place where there ought to be good, safe insulation for safety to persons, it is a case of negligence on the part of the electrical corporation rendering it *prima facie* liable." And on the second proposition the same case holds: "If one take hold of an electric wire at a place where it ought to be safely insulated for safety to persons, and is injured by reason of defective insulation, he not knowing its defect, he is not from so doing guilty of contributory negligence forbidding re-

covery of damages." And that, "in places where electric wires should be insulated for safety to the persons, one may assume that they are so insulated, if he know not to the contrary." In the Thomas case these principles were applied in the case of a workman at work on a balcony of an opera house who came in contact with defendants' wires extending to a bracket on the wall of the opera house. In Virginia they were applied in the case of a boy eight years old, who sitting upon a box along a street, and seeing, hanging through the limbs of a tree, in an adjacent yard, what he supposed to be a string, put his hand through and over the railing, grasped the wire and was injured. *Lynchburg Tel. Co.* v. *Booker,* 103 Va. 594.; in Connecticut, in the case of a boy sixteen years of age who was killed by an electric shock from a wire strung along a highway bridge, and who at the time was on the truss of the bridge preparing to dive and caught the wire to prevent himself from falling. Boys had been in the habit of diving from and swimming around the bridge, a fact known to the selectman of the town and to defendant. *Nelson* v. *Branford Lighting and Water Co.,* 54 Atlantic Rep. 303. The facts in this case are quite similar to those in the case at bar. They were also applied in Mississippi, in the case of a boy ten years of age who while climbing an oak tree sustained a shock by coming in contact with a wire which defendant had negligently permitted to become and remain uninsulated. *Temple* v. *Electric Co.,* 42 So. Rep. 874. It was held in this case that defendant was bound to take notice of the immemorial habit of small boys to climb such trees. They were also applied in Texas, in the case of a police officer who, in the discharge of his duty, went on the roof of a building in the night time for the purpose of discovering persons who were violating the law, and received injuries by coming in contact with an electric wire of the defendant, negligently left in a dangerous position on the roof, and not properly insulated. *City of Greenville* v. *Pitts,* 102 S. W. Rep. 451. So also in Missouri, in the case of a laborer engaged in hanging and taking down signs from buildings, a case similar to our case of *Thomas* v. *Electrical Co., Geismann* v. *Missouri Edison Electric Co.,* 8 Am. Elec. Cases, 569. And these are the principles which we think were rightly applied by the court below to the case at bar.

Whether that degree of care in the construction, inspection and repair of the wires carrying highly dangerous currents of electricity imposed upon one employing them so as to keep them harmless at places where persons are liable to come in contact with them has been exercised in the given case is ordinarily for the jury. *Thomas* v. *Electrical Co., supra,* (Syl. 3) ; *Perham* v. *Electric Co.,* 7 Am. Elect. Cases, 487 ; *Birsch* v. *Citizens Elect. Co.,* 36 Mont. 574.

The question whether or not the person injured, under the circumstances like the case at bar has been guilty of contributory negligence is likewise a question for the jury. *Geismann* v. *Elect. Co., supra; Thomas* v. *Elect. Co., supra.*

In this case the record shows that judge and jury visited and viewed the place where young Blosser was killed. True the wires were not in exactly the same condition and situation as on the evening of the accident; but having seen and viewed the premises, and heard the testimony of the witnesses, they were better able to judge of the merits of the case than we can be from a mere consideration of the record of the trial and the arguments of counsel. The case seems to have been well and carefully tried, before a learned judge, assisted by able counsel on both sides, and we cannot say that any error has been committed. There is nothing for us to do therefore but order an affirmance of the judgment.

*Affirmed.*