# WALPOLE v. TENNESSEE LIGHT & POWER CO.—89 S. W. (2d) 174.

Middle Section.   July 20, 1935.

Petition for Certiorari denied by Supreme Court, January 11, 1936.

Jno. E. Garner and Jake A. O'Brien, both of Springfield, for plaintiff in error Power Co.

Hardin H. Conn, of Springfield, for defendant in error Walpole.

CROWNOVER, J. This cause should be styled Tennessee Light & Power Company, Plaintiff in Error, v. Watt Walpole, Defendant in Error, as judgment was rendered in the lower court in favor of Watt Walpole and the power company appealed in error to this court.

This is an action for damages for personal injuries averred to have been caused by the negligent manner in which defendant constructed and maintained its electric power transmission line, which resulted in plaintiff's being burned by electricity.

Defendant pleaded the general issue of not guilty.

The action was tried by the judge and a jury. At the close of plaintiff's evidence and again at the conclusion of all the evidence, defendant moved the court for a directed verdict in its favor, which motions were overruled. The jury returned a verdict of $2,000 in favor of the plaintiff, and judgment was entered accordingly.

Motion for a new trial having been overruled, defendant appealed to this court, and has assigned errors which raise only two propositions:

(1) There was no evidence of negligence on the part of defendant, and the court erred in not directing a verdict in its favor.

(2) The plaintiff was guilty of contributory negligence.

The defendant, Tennessee Light & Power Company, is a corporation engaged in the manufacture and distribution of electricity. It has a plant at Springfield, Tennessee, and one of its transmission lines extends from Springfield to Adairsville, Kentucky, a line of poles and high-tension wires being placed along the Adairsville pike. It is successor to the Davidson Light & Power Company, which company was granted a franchise by Robertson county to erect a power line on that highway in 1923; the right of way at that time being 50 feet wide.

In October, 1928, the state of Tennessee having taken over the highway, the state highway department widened the right of way, making it 60 feet wide, and required the power company to move its poles back about 5 feet.

The Springfield to Adairsville pike leads approximately north and south. The transmission line is on the east side until it reaches a point about 400 yards south of Mrs. Miles' residence, when it crosses the pike and extends along the west side.

The poles were chestnut posts with two cross-arms on each, 5 feet wide. The upper line consisted of three wides and carried a current of 13,000 volts. This line was 23 feet 1 inch from the ground. The lower line of wires carried a current of 2,300 volts and was placed

18 feet 9½ inches from the ground. The wires were not insulated. Danger or warning signs were placed on some of the posts.

Mrs. Bessie Miles lives on the Adairsville pike, 3 miles from Springfield, on the east side. There is a well on Mrs. Miles' property, on the opposite side or west side of the highway from her residence, near the right of way. In 1914 she erected a house over the well and installed a pump in it, which was operated by electricity, and pumped water into her house. At this time Mrs. Miles had a private electric line from Springfield, which the company bought when it erected this line on the Adairsville pike.

The well house is approximately 10x11 feet, 8 feet to the eaves, 10 or 12 feet to the comb of the roof. When the electric line was moved back in 1928, it was placed 9 feet and 3 inches from the well house and 23 feet and 1 inch above the ground. The water in the well is 30 feet below the surface of the ground. Two wires from the power line led to an electric motor in well house to furnish power to operate the pump.

On May 12, 1932, Mrs. Miles engaged Forrest Whiting, a plumber, to install a new automatic electric driven pump. Whiting carried his helper, Watt Walpole, the plaintiff, with him to Mrs. Miles' home. After installing the pump in the basement, they crossed the road to the well house.

There are several trees close to the well house and one on the right of way. The branches of these trees completely concealed the wires for a space of about 25 feet near the well. Standing at the door of the well house and looking up, no wires could be seen, but the line of poles and wires further up and down the road could be seen.

There was an old pump in the well, and about 27½ feet of iron pipe in two sections, one 20 feet and one 7½, were used to pump the water. The head of the pump rested on heavy timbers placed across the top of the well. This pump and old pipe had to be removed in order to put in new pipe to connect with the new pump installed in Mrs. Miles' basement. Whiting and plaintiff, Walpole, disconnected the pump and moved it. The pipe consisted of a 20-foot long section and a piece 7½ feet long; it was old and rusty. In order to get the pipe out of the well, it was necessary to make a hole in the roof and push the pipe through it. This was the way in which the pipe was always taken from the well when necessary to replace it. Walpole knocked several shingles from the roof, on the east side (towards the highway), which were loose, as they had been removed for this purpose prior to this time, and they lifted the pipe from the water, pushing it through the roof. When they had lifted the 20-foot piece from the water they did not disconnect it from the 7½-foot piece, the joint being rusty, but lifted the

whole 27½ feet of pipe out in one piece, which caused the pipe to stand 27½ feet above the ground, and rested the end of it on a plank.

Whiting then stood by the side of the pipe with it resting against his shoulder, and directed Walpole to remove a plank from the west side of the house for the pipe to be taken through, as trees had grown up in front of the door. Walpole went out of the door, which was in the south end of the house, and went to the west side and removed a plank. Whiting had told him he would hand the lower end of the pipe out to him. Whiting, on the inside of the pump house, raised the 27½ feet of pipe, rested it on his shoulder, and stepped from the piece of timber to the wet ground. Whiting's face flushed and he stumbled or fell toward Walpole, and the lower end of the pipe was pushed through the opening in the wall, and Walpole, thinking he had merely stumbled, undertook to catch the lower end of the pipe. The upper end of the pipe had been turned towards and touched the 13,000 volt line, and, when Whiting stepped on the wet ground, this caused a ground connection of the electric current through his body, and he was instantly killed. Walpole did not catch the pipe, but his left wrist struck it and he was thrown 10 or 15 feet and rendered unconscious. His left wrist was so badly burned that it became necessary to amputate it several inches below the elbow.

Watt Walpole was a man about 31 years of age, a laborer and plumber's helper. He lived in the town of Springfield. He had never been on Mrs. Miles' property before. He had never lived or worked in this vicinity. He did not know that this line of high-tension wires was along the highway.

He did not see the wires as he crossed the road, and, when he reached the well house, he could not have seen them if he had looked because of the trees and the leaves on the trees. He says that prior to this he had seen the line of wires but thought they were telephone wires. But he admits there was a telephone line on the opposite side of the road.

1. The question of the power company's negligence was properly submitted to the jury. The proof is uncontroverted that the wet iron pipe, 27½ feet long, which plaintiff and Forrest Whiting pulled out of the well, and thrust through a hole in the east side of the roof (the side of the roof nearest the wires), was allowed by them to tilt over and fall against the high-tension wires, which carried 13,000 volts, causing the injury to plaintiff, and that said wires were 23 feet and 1 inch from the ground, and directly above a point 9 feet 3 inches from the pump.

· The plaintiff, Walpole, contends that the power company was guilty of negligence as follows: (a) That it failed to insulate its wires; (b) that it gave no warning of danger by posting notices of danger; (c) that its wires, carrying 13,000 volts, were not placed at a suf-

ficient height from the ground; (d) that it allowed branches of the trees to grow around the wires and conceal them from view, so that a person could not have discovered said high-tension line.

Defendant denies all acts of carelessness and negligence charged against it, and insists that its transmission line was constructed, maintained, and operated in the usual prescribed and proper manner at a sufficient height above ground, and that the accident was caused by plaintiff's own carelessness and negligence, and insists that the court should have directed a verdict in its favor as a matter of law; it being claimed that the evidence was insufficient to support any finding of negligence on its part, also that the evidence conclusively showed that plaintiff was injured as the result of his own negligence.

(a) There is much evidence in the record that there cannot be insulation of high-tension wires and that lines carrying the high voltage are not generally insulated. And it is not shown that there is any statute requiring insulation of such wires placed at any given distance from the ground.

The National Bureau of Standards referred to in evidence in this case does not require that they be insulated. The duty of insulation seems to be limited, according to the authorities, "to those points or places where there is reason to apprehend that persons may come in contact with the wires, and the law does not compel electric companies to insulate their wires everywhere, but only at places where people may go for work, business, or pleasure, that is, where they may reasonably be expected to go." 9 R. C. L., 1213, sec. 31.

"The exercise of a sufficient degree of care requires a careful and proper insulation of all wires and appliances in places where there is likelihood or reasonable probability of human contact therewith. . . .

"The duty to insulate does not extend to the entire system or to parts of the line where no one could reasonably be expected to come in contact with it." 20 C. J., 355, sec. 42.

But whether an electric company has been guilty of negligence in the insulation of its wires is, like most other questions of negligence, a matter for the jury to determine, though in some cases, where there is no conflict in the evidence, the question is one of law for the court. Curtis, Law of Electricity, 771, sec. 511, sec. 510; Steindorff v. St. Paul Gaslight Co., 92 Minn., 496, 100 N. W., 221; Thomas v. Wheeling Electrical Co., 54 W. Va., 395, 46 S. E., 217; Thornburg v. City & E. G. Ry. Co., 65 W. Va., 379, 64 S. E., 358.

"Either the wire must be insulated, or it must be so located as to be, comparatively speaking, harmless. If the company does not choose to properly insulate a deadly wire of its maintenance, it

must place the same underground, at a high altitude, or at some inaccessible place." Curtis on Electricity, 772, sec. 511.

And this is especially true where it is placed among trees. Id., sec. 512.

■ Under the circumstances arising in this case the question was one for the jury.

■ (b) There was evidence that the company had placed warning signs on its line, but the questions whether it was guilty of negligence in not placing them at this particular place, where the wires were concealed by the leaves of the trees, and whether it was reasonable to expect people to come in contact with the wires at that place, were likewise for the jury.

■ (c) The principal contention of the plaintiff is that the power company's 13,000 volt line of wires was too low; that in passing this pump house the wires should have been elevated; that the power company should have taken into consideration the fact that iron pipe would have to be removed from the well and that it would have to be taken out through the roof in the manner that it was done on this occasion.

There seems to be no statute regulating the height of wires, and it is not shown that there is any provision in their franchise fixing the height at which they shall be maintained, or in the National Electric Safety Code. There is no established custom about the height of poles.

There were several references in the evidence to the National Electric Safety Code, issued by the United States Department of Commerce, Bureau of Standards, but it was not introduced in evidence, and evidence that it did not have any requirement as to the height of high-tension lines was not excepted to.

"It is conceded that the Bureau of Standards has no power to regulate the placing of electric wires, and that the book has no compulsive force. It was issued under permission of 15 U. S. C. A., sec. 274, as 'information which may be of value to the public.' No law required it. It represents merely the opinion of the compilers, and its preface states that as to many matters there are conflicting views." Miss. Power & Light Co. v. Whitescarver (C. C. A.), 68 F. (2d), 928, 930.

Aside from these various ways in which the company's discretion may be limited, there is a common-law obligation to maintain its appliances so as not to obstruct the highway unnecessarily. Curtis' Law of Electricity, 734, sec. 495.

Carl Klemm, an electrical engineer, testified that this line of poles and wires is of standard construction. Rex Smith, an electrical engineer, testified that the high-tension line should have been 30 to 35 feet high at the point of this building.

We think the question whether the placing of these high-tension

wires only 23 feet and 1 inch from the ground at this place was negligence is one for the jury, and was properly submitted to the jury.

"The degree of care required of one handling the dangerous agency of electricity depends upon the danger from the current, slight care being sufficient where the current would not injure persons with whom it came in contact, and the highest care being necessary where the current would be fatal to human life, as in the case of a high tension wire in dangerous position." Card v. Wenatchee Valley Gas & Electric Co., 77 Wash., 564, 137 P., 1047, 20 C. J., 343; Memphis Street Railway Co. v. Kartright, 110 Tenn., 277, 75 S. W. 719, 100 Am. St. Rep., 807; Nashville Railway & Light Co. v. White, 7 Tenn. Civ. App., 367; Bristol Telephone Co. v. Weaver, 146 Tenn., 511, 525, 243 S. W., 299.

"In an action for the wrongful death of one killed by the electric current carried by defendant's wire, the question of defendant's negligence in stringing high power wires within 17 feet of the ground and over decedent's land was held, under the evidence, for the jury." Card v. Wenatchee Valley Gas & Electric Co., supra.

The courts held that the question of negligence in placing hightension wires certain heights above ground was for the jury. McGinnis v. Delaware, L. & W. Ry. Co., 98 N. J. Law, 160, 119 A., 163; Chace Trucking Co. v. Richmond, L. & R. Co., 225 N. Y., 435, 122 N. E., 210; Miss. Power & L. Co. v. Whitescarver (C. C. A.), 68 F. (2d) 928, affirming (D. C.), 5 F. Supp., 948.

"Contention is made that the coming in contact with this wire by deceased in the manner shown was so extraordinary as not to require anticipation thereof by appellant. It may be that the particular manner of coming in contact with the wire would hardly be anticipated by appellant or its agents. That, however, it seems to us is not the real test. As was said by Justice Siebecker, speaking for the Supreme Court of Wisconsin in Wilbert v. Sheboygan, etc., Ry. Co., 129 Wis., 1, 106 N. W., 1058, 116 Am. St. Rep., 931: 'To say that a condition is reasonably to be apprehended does not imply that the exact condition proven as to the erection of this tree wire was to have been expressly contemplated, but it implies that a dangerous condition, in the nature of this one, was likely to arise in connection with the conduct of appellant's business.' It seems to us it is not so much a question of what particular incident might occur to bring a person in contact with the wire, but whether a person, following his usual avocation where he has a right to be, might in any manner be brought in contact with the wire. It seems to us, in view of the deadly character of this powerful current, the high degree of care required of appellant in its maintenance, and the fact that it was suspended over the land of deceased at the height of 17 feet, the jury might well conclude that appellant was bound to anticipate occurrences of the nature here

involved. We are of the opinion that, under all the circumstances, the question of appellant's negligence was one for the jury, and could not be determined as a matter of law." Card v. Wenatchee Valley Gas & Electric Co., 77 Wash., 564, 137 P., 1047, 1049.

■ (d) The question whether the company was negligent in allowing the leaves and the branches of the trees to conceal its wires should have been submitted to the jury.

There is some conflict in the evidence of witnesses for plaintiff and for defendant as to whether the trees had been trimmed in May, 1932. Witnesses for defendant say that in May, 1932, the trees had been trimmed and the high-tension wires and the wires going to the pump house could be plainly seen. Witnesses for the plaintiff say the wires were entirely concealed for a space of about 25 feet. But it is admitted by plaintiff's witnesses that the rest of the line of wires could be seen.

Walpole insists that the company was negligent in allowing the branches and the leaves of the trees to conceal its high-tension wires at this place, where it had reason to anticipate that persons might be injured by coming in contact with it. What we said in discussing (a) and (b) above applies to this proposition, and we think it is a question for the jury.

■ 2. The question of the plaintiff's contributory negligence was properly submitted to the jury, in view of the fact that the high-tension lines were concealed by the leaves of the trees and the plaintiff had no knowledge of their existence at that place. Card v. Wenatchee Valley Gas & Electric Co., supra; Chace Trucking Co. v. Richmond Light & Railroad Co., supra; McGinnis v. Delaware, L. & W. Railroad Co., supra; Curtis on Electricity, 808-810, sec. 533; Texas-Louisiana Power Co. v. Webster (Tex. Civ. App.), 59 S. W. (2d), 902, 910.

Plaintiff avers in his declaration that the line was not properly equipped with safety fuses and automatic safety release switches. The superintendent of the power company testified that their substation was equipped with an automatic circuit breaker, a Westinghouse B-16, of standard manufacture, fuses not being used now. He further testified that there is no known device that will prevent the current flowing through the body of a man standing on the ground with an iron pipe in his hand and contact made with the line. The president of the company testified that there is no device of any kind which would have opened the switch where a man is standing holding a wet pipe in his hands which is in contact with a 13,000 volt line. A release switch would not have cut off the currents before Whiting was killed and Walpole injured. This evidence is not disputed.

It results that all the assignments of errors are overruled, and the judgment of the lower court is affirmed. A judgment for $2,000

and interest thereon from June 21, 1934, to the present will be entered in this court in favor of Walpole and against the Light & Power Company. The cost of the cause, including the cost of the appeal, is adjudged against the Light & Power Company and the surety on its appeal.

Faw, P. J., did not participate in the consultation or the decision. DeWitt, J., concurs.