MRS. MILDRED ROGERS, Adm'x, Plaintiff in Error,
v. CITY OF CHATTANOOGA, etc., Defendant in Error.
—281 S. W. (2d) 504.

En Banc. September 20, 1954.

Petition for Certiorari denied by Supreme Court, March 11, 1955.

Crawford Bean, and Harry Berke, both of Chattanooga, for plaintiff in error.

Chambliss, Chambliss & Brown, of Chattanooga, for defendant in error.

CARNEY, J.  Plaintiff brought a suit for damages for the death by accidental electrocution of her husband, Ollie Y. Rogers, who was killed on November 12, 1952, in Chattanooga, Tennessee.  The deceased was employed with a number of workmen in unloading some steel from a parked truck at the site of the erection of an annex to the building occupied by Mertland-Hedges Company located at the corner of Main and Madison Streets in Chattanooga.  The accident occurred just south of the parent building and on the east side of Madison Street.

The question presented on this appeal is whether or not the Trial Court correctly sustained defendant's motion for a directed verdict made at the conclusion of all the proof in the case.  The Motion was first overruled; the case went to the jury, which was unable to agree.  Upon defendant's Motion for a New Trial, the Court sustained the Motion for a directed verdict and dismissed the suit. Plaintiff's Motion for a New Trial was then overruled, and she brings this appeal and assigned errors, which are substantially as follows:

"1. No evidence to support the action of the Court in directing such a verdict for the defendant.

"2.  Because the undisputed proof showed that the defendant was guilty of at least three acts of negligence, any one of which would be sufficient to support a verdict for the plaintiff—to wit:

"1.  Because the wires were too low and not high enough above the street level for safety.

"2. The wire was too close to the building for safety.

"3. The wires in such close proximity to the street and building should have been insulated.

"3. The undisputed proof showed that the defendant by its own admission admitted that the accident would have been prevented had one agency notified the other agency of the defendant that a building was going to be erected, and that the issue of negligence is for the jury."

The evidence revealed the following:

The defendant, City of Chattanooga, in its proprietary capacity operates an electrical distribution system for the City of Chattanooga under the name of Chattanooga Electric Power Board. A high tension line bearing approximately 11,000 volts ran northwardly and southwardly along the east margin of Madison Street, and at the site of the accident in this case the lines were about 27 feet above the ground. The easternmost wire was about 4 feet 3 inches from the western edge of the top of the manufacturing plant of the Hedges Company.

On the day in question the deceased, along with other employees of the Lloyd E. Jones Construction Company, was engaged in putting up the steel framework for the annex to the Hedges building. The workmen were using a portable boom mounted on a truck for placing the different pieces of steel in place for the new construction. A new supply of steel beams was delivered by truck to the site of construction and the foreman of the work crew directed the crew, including the deceased, to unload the beams from the truck.

The portable boom on a truck was backed across the lot near the edge of Madison Street and the men proceeded to unload the steel beams.

The top of the boom was 31 feet high and higher than the electric wires. The operator of the truck carrying the portable boom understood the danger and parked his truck so that the top of the boom and the cable which dropped down to pick up the heavy steel beams would be about 3 feet from the power line. The exact location of the back wheels of the boom truck were marked by some pieces of 2 x 6 timber. The first piece of steel was removed by the cable which ran over a pulley at the top of the boom and then down to the ground being  hooked around the beam, then the winches in the cab of the boom truck began to turn and tighten the cable, lifting the heavy piece of steel clear of the parked truck. Thereupon the driver of the boom truck with the steel thus suspended drove across the lot and deposited the piece of steel at the appointed place for later use.

The boom truck returned for another piece of steel, the cable had been tightened and the steel beam was in the process of being lifted. The deceased workman was standing on the ground holding or pushing on the steel beam to guide or keep the same balanced, when a current of electricity from the high tension wires ran down the cable through the piece of steel and shocked the deceased, Ollie Y. Rogers, and another workman, George Skillern, who had hold of the other end of the Steel beam. The driver of the boom truck pulled off to break the current; first aid was administered to the workmen, but the deceased died within a very short time. The other worker, Skillern, was injured, but did not die, and was a witness for plaintiff in the trial below.

The ground on which deceased was standing was very wet, and plaintiff contended that the atmospheric conditions and the heavy load of electricity on the wires caused

the electricity to arc or jump from the line over to the boom cable, and that the boom cable itself never came in contact with the high voltage wires. There is proof by some of the witnesses that there were no burned or marked places on the cable, thus indicating that the electricity did arc and there was no direct contact. However, an eyewitness for defendant testified that it appeared to him that the cable came in contact with the high voltage wire itself. We do not see that it is material to a decision in this case to determine wherein the preponderance lies on this issue, and that the liability of the defendant would be the same, whether the electricity did arc to the boom cable, or whether the cable actually touched the wire. There is no question but that deceased died by electrocution.

The defendant insisted, first, that it was guilty of no negligence and that it could not reasonably have foreseen that the plaintiff's intestate would have received the injuries sued for, and, second, that the proximate cause of plaintiff's injuries was a conscious intervening agency in the form of the operator of the boom who, knowing the dangerous nature of the wires, deliberately and consciously chose to leave the boom extended to an unusual height with the result that the boom cable touched the wires and caused the accident.

The proof in the record is that the boom as it was being operated was 28 feet long, which, together with about three feet from the truck bed to the ground, made a total height of 31 feet, and that it was being thus used in erecting the steel framework to the annex to the building; that for purposes of unloading steel a boom length of only about 8 feet would have been required to adequately unload the beams from the parked truck.

The length of the boom could have been substantially shortened and could have been made short enough not to reach the wires, but it would have taken fifteen to thirty minutes to make such a change. The foreman of the work crew explained that this was not done because the crew was primarily engaged in erecting the steel framework of the building which required the 28-foot boom, and that they had stopped only a short time to unload the few pieces of steel. They did not deem it necessary to spend fifteen to thirty minutes to shorten the boom, unload the small load of beams, and then spend fifteen to thirty minutes lengthening the boom to go back to building the steel framework.

The proof shows that the wires were strung along Madison Street before the Hedges building was built, and they were strung somewhat closer to the ground because some distance away they were crossed at right angles by other wires carrying 40,000 volts, and after having dropped down from about 40 feet to 28 feet to come under the 40,000-volt line, they were strung on the same level for a considerable distance and on past the scene of the accident in this case before they were raised again. The 11,000-volt line was about the same height as the Hedges building and about 4 feet 3 inches west of the top of the Hedges building. Since the construction of the lines the Hedges building has been built and one annex thereto has been built, and a second annex was being built at the time plaintiff's intestate was killed.

It is admitted by Mr. Floyd, the engineer for the defendant company, that the location of the wires only 4 feet 3 inches from and no higher than the top of the building was dangerous and unsafe insofar as the building and persons on the building were concerned. However, he insists that at the time the wires were strung, a height

of 27 feet was, in his opinion, safe insofar as the ground was concerned because there were no buildings. He further testified that power companies customarily work on a basis of a minimum height of 20 feet above the ground for lines carrying 11,000 volts.

Plaintiff's witnesses, consisting of linemen and other people who have worked around electricity a number of years, testified, in substance, that, in their opinion, the height of the wires of 27 feet at this location for wires carrying 11,000 volts was unsafe, and that the wires should have been from 35 to 40 feet high.

There are no State Statutes or City Ordinances regulating the installation and maintenance of high voltage power lines. The witnesses all seem to agree that the height of the wires depends upon the amount of voltage carried and the location of the wires, that is, whether industrial or congested area, open fields, etc. The area where this accident occurred was zoned as industrial.

The wires were not insulated and the testimony indicates a common practice among power companies not to insulate high voltage power lines due to the high cost involved.

The defendants did not plead and there is no suggestion in the record of any contributory negligence upon the part of plaintiff's intestate, so the ultimate question presented is whether or not there was material evidence of such negligence on the part of the defendant which the jury might find was the direct and proximate cause of the death of the plaintiff's intestate.

We think there was such evidence and that the Motion for a directed verdict was improperly granted.

Electricity, if not properly safeguarded, is one of the most dangerous and lethal agencies known to man. Inter-

national Harvester Co. v. Sartain, 32 Tenn. App. 425, 222 S. W. (2d) 854, 867.

From 18 Am. Jur.—Electricity—p. 485, Sec. 93, we quote as follows:

"93. Insulation And Care Of Wires.—From the very nature of its business, an electric company using highly charged wires owes the legal duty, irrespective of any contractual relation, toward every person who, in the exercise of a lawful occupation in a place where he has a legal right to be, whether for business, pleasure, or convenience, is liable to come in contact with the wires to see that such wires are properly placed with reference to the safety of such persons and are properly insulated; but, as a matter of course, this rule does not apply to a case where a consumer wrongfully makes connections with the wires and is injured by the current escaping from the appliance so installed. The rule that persons controlling so dangerous and subtle an Agency as electricity should not be permitted to theorize in regard to its probable effects or speculate upon the chances of results affecting human life is only in accord with reason and common sense. The wires must be either insulated or placed beyond the danger line of contact with persons going where they may reasonably be expected to go   *   *   *

"The reason for requiring electric companies properly to insulate their wires is apparent since electricity is the most deadly and dangerous power recognized as a necessary agency in developing civilization and promoting our comfort and business affairs. Therefore, in behalf of human life and the safety of mankind, it behooves those who would profit by the use of this subtle and violent element of

nature to exercise the greatest degree of care and constant vigilance in inspecting the wires and in maintaining them in perfect condition.

"Insulation, however, is not always possible, but this fact does not relieve an electric company of its alternative duty to put and keep the wires in such a place that a person using due care and caution for his own safety and in the exercise of his rights and privileges in a place where he may reasonably be expected to go will not be injured thereby, which duty in itself, if performed, constituted a fulfilment of the obligation imposed by law."

Likewise, from Walpole v. Tennessee Light & Power Co., 19 Tenn. App. 352, at page 357, 89 S. W. (2d) 174, at page 177, we quote as follows:

"We think the question whether the placing of these high-tension wires only 23 feet and 1 inch from the ground at this place was negligence is one for the jury, and was properly submitted to the jury.

" 'The degree of care required of one handling the dangerous agency of electricity depends upon the danger from the current, slight care being sufficient where the current would not injure persons with whom it came in contact, and the highest care being necessary where the current would be fatal to human life, as in the case of a high tension wire in dangerous position.' Card v. Wenatchee Valley Gas & Electric Co., 77 Wash. 564, 137 P. 1047; 20 C. J., 343; Memphis Street Railway Co. v. Kartright, 110 Tenn. 277, 75 S. W. 719, 100 Am. St. Rep. 807; Nashville Railway & Light Co. v. White, 7 Tenn. Civ. 367; Bristol Telephone Co. v. Weaver, 146 Tenn. 511, 525, 243 S. W. 299.''

The defendant, City of Chattanooga, had granted building permits for the erection of the Hedges building, for the erection of the annex, and for the erection of the second annex which was in progress at the time of the accident so that it had notice of the erection of this building and that workmen would be engaged in and about the premises constructing the annex.

We think that the City was required not only to install or erect the uninsulated high-tension wires, which carried death for anyone who came in contact with them, at a safe height above the ground, but that it was also under a duty to patrol and inspect said lines at frequent intervals to see that the lines did not later become unsafe and dangerous by changing conditions, such as, overhanging tree branches, erection of buildings, etc. It appears that certainly the City was negligent in leaving these deadly wires only 4 feet 3 inches from the top of the Hedges building because Mr. Floyd, the engineer for the Power Board, testified that it was unsafe and dangerous for said wires to be so close to the Hedges building, and Mr. Floyd also admitted that if they had known that the annex was being built, they would have raised the lines as was done after the accident.

Nor can we agree with the insistence of the defendants that if the deceased had been standing on top of the Hedges building and had in some manner come in contact with the current from this 11,000-volt wire, that there was evidence from which the jury could find the defendant liable, but that since the deceased was not killed while standing on top of the building, but was killed while standing on the ground and working on an annex to this same building, by current from the same high-tension wire, there is no evidence from which the jury could find the defendant liable.

We think that there was ample evidence from which the jury might have found that the defendant, in maintaining said power lines at 27 feet in height along this industrial area, should have reasonably foreseen that people would be working near or under these high-tension lines and that machinery similar to the boom and boom cable used in the instant case might come in contact with or such proximity to said high-tension wires so as to conduct the current, causing death or great bodily harm to one or more persons. Especially so since the City had issued a permit to build the original building, to build the first annex, and to build the annex which was under construction. The proof shows that the City's Building Inspector was present and observed the construction work being carried on. It would hardly appear to be a complete defense to liability for the City to be able to say that due to improper or lack of coordination the City's Electric Power Board was not chargeable with notice of information received by the City through its Building Inspection Department.

Likewise, we must respectfully disagree with the insistence of the defendant-in-error that there was no evidence upon which the jury could find that the negligence of the defendant was the direct and proximate cause of the death of the deceased and that the proof showed that the direct and proximate cause of the death of plaintiff's intestate was the conscious intervening negligence of the driver of the boom truck in putting the cable too close to the dangerous wires.

A similar point was made in International Harvester Co. v. Sartain, 32 Tenn. App. 425, 222 S. W. (2d) 854, 867, where a worker was burned while installing iron rods in the steel work of a new building when he allowed one of the rods to touch a high-voltage power line. At page 869, of 222 S. W. (2d), the Court said:

"(21) The essence of the rule is whether the subsequent successive acts and injurious results were probable and therefore to be anticipated. Garis v. Eberling, 18 Tenn. App. 1, 71 S. W. (2d) 215; Gannon v. Crichlow, 13 Tenn. App. 281; Ford Motor Co. v. Wagoner, 183 Tenn. 392, 192 S. W. (2d) 840, 852, 164 A. L. R. 364.

"For a learned discussion of what is meant by probable or reasonably foreseeable, see opinion of Judge Felts, Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450.

"(A delirious patient left unguarded jumped out of an upper window)."

The jury might well find that these defendants in erecting and maintaining a 11,000-volt electrical line at this particular location, to-wit, an industrial area, should have reasonably foreseen that someone might negligently allow an iron pipe, a boom cable, or other conductor of electricity, to come too close to the high-tension wire and as a result thereby one or more persons be killed or greatly injured. If the jury should find that the defendant should have reasonably foreseen that such might happen and failed to take the necessary steps to prevent the same, then it would be guilty of negligence which was the direct and proximate cause of such injuries.

As was said in Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450, 456:

" 'If there is a substantial likelihood that certain conduct, when pursued by the defendant, will result in some appreciable harm to the plaintiff's person, then the defendant, if he so conducts (sic), cannot escape liability on the ground that he could not foresee the precise manner in which the harm would occur, nor the exact nature of the harm, nor the full

extent of such harm. What must be foreseen, in order to establish negligence, is ''harm in the abstract, not harm in the concrete.'' ' ''

It follows that we must hold that it was properly a matter for the jury to determine whether, under all the facts and circumstances, the acts of the defendant in erecting and maintaining the 11,000-volt power line uninsulated at the site of the accident in this case, at a height of 27 feet, constituted negligence, and if such conduct was found to be negligent, whether said negligence was the direct and proximate cause of the death of plaintiff's intestate.

The Assignments of Error are sustained, and the judgment of the Trial Court must be reversed and the case remanded for a new trial. The defendant-in-error will be taxed with the costs of the appeal.

McAmis, P. J., and Howard, Felts, Hale, Hickerson, Howell and Avery, JJ., concur.

Bejach, J., did not participate in the decision of this case.

Hale, Judge (concurring).

Because of a dissent I am this day filing in the case of Kingsport Utilities, Inc., v. Brown, from the Circuit Court of Sullivan County, I think it best to state my reasons for my concurrence in the result reached in the instant case.

In Kingsport Utilities, Inc., v. Brown, I set forth my views on the law applicable, and concluded there was no evidence of improper construction or dangerous maintenance of the line in question, in that the undisputed evidence showed construction and maintenance in accordance with the National Electrical Safety Code.

In the instant case the defendant was not allowed to plead and rely upon the aforementioned National Electrical Safety Code due to failure to file special pleas within the time allowed. And there is material evidence that the line in question at this particular point was not maintained at a proper and safe distance from the ground. In addition the defendant had knowledge of the work being done at this point. These factors distinguish this case from Kingsport Utilities v. Brown.

I am unable to agree with that part of the opinion in the instant case, 281 S. W. (2d) 508, which said the defendant was "under a duty to patrol and inspect said lines at frequent intervals to see that the lines did not later become unsafe and dangerous by changing conditions, such as, overhanging tree branches, erection of buildings, etc." In practical effect, this would be to hold the utility liable as an insurer.