BERTHA PHELPS, Appellant, v. THE MAGNAVOX
COMPANY OF TENNESSEE, INC. and
JOHNSON CITY POWER BOARD,
Appellees. No. 31.—466 S.W.2d 226.

Eastern Section. August 21, 1970.

Certiorari Denied by Supreme Court April 19, 1971.

Todd & Dossett, Kingsport, for Bertha Phelps.

Milligan, Silvers & Coleman, Greeneville, Epps, Powell, Weller, Taylor & Miller, Johnson City, for Magnavox Co.

Bryant, Price & Brandt, Johnson City, Hunter, Smith, Davis, Norris, Waddey & Treadway, Kingsport, for Johnson City Power Board.

PARROTT, J. In this circuit court action Bertha Phelps sues Magnavox Company of Tennessee and Johnson City Power Company seeking damages for the death of her husband, William Phelps, who was electrocuted when the handle of a mop Phelps was using to apply roofing materials on a new building being constructed for the use of Magnavox came in contact with electrical transmission wires through which electricity was supplied by the defendant, Johnson City Power Company.

Plaintiff has appealed from the action of the circuit judge's directing verdicts for the defendants at the close of plaintiff's proof. In sustaining defendants' motion, the trial judge found the decedent to be guilty of contributory negligence as a matter of law so as to bar any recovery.

Plaintiff's two-count declaration charges both defendants with gross negligence in violation of their common law duty, certain city ordinances, the National Electrical Code and Southern Standard Building Code by permitting and allowing, without warning, uninsulated high voltage wires to be erected and maintained at an unlawful and insufficient height over and above the roof of defendant Magnavox's building.

Defendants filed special pleas denying any guilt of negligence and averring the decedent's contributory negligence was the sole and proximate cause of his death.

Decedent, William Phelps, was a twenty-five year old roofer with some three years experience as an employee of Industrial Decking and Roofing Company of Bristol, Virginia. On February 1, 1967, Phelps, while working for his employer who had contracted to install a roof on a new dry kiln building being constructed for Magnavox,

was electrocuted. The lethal electric shock was received while attempting to insert a six-foot aluminum handle in a roofing mop. There is no direct evidence as to whether the mop handle actually came in contact with the electric wires that were only 68 inches above the roof where Phelps was working, but the evidence affirmatively and conclusively shows Phelps' death resulted from an electric shock.

At the time of the accident the only other person on the roof with Phelps was fellow employee, Bobby Goodson. According to Goodson, he was helping Phelps assemble the mop and at the same time Phelps reached for the aluminum handle, Goodson reached for a hammer to drive the mop onto the handle. While in a stooped position and unable to see Phelps, Goodson felt a shock and heard a "buzzing to ringling sound." He then ran to the other side of the building. When he looked back he saw Phelps lying on the roof, face up, with one leg draped across a roll of felt.

At the time of the accident Phelps' foreman, Charlie Bailey, and another employee, Marvin Goodson, were on the ground preparing the materials to be put on the roof. Neither of these men were able to see what happened on the roof.

There was undisputed evidence that on the day before Phelps' accident, foreman Bailey received a shock from these same wires. Bailey's shock was of such severity that it knocked him to his knees and rendered him momentarily senseless. When Bailey received his shock, Phelps was on the roof with him and was one of the men who came to Bailey's aid after the shock.

On the morning of the fatal accident, while riding to the job, Phelps told the other men during a discussion of the electric wires that he did not want to mop under the lines. The men had been on the roof some thirty minutes before the accident occurred and foreman Bailey testified that just a few minutes before the accident he called to Phelps and Goodson to watch out for the power line.

A representative of the power board came to the construction site and was shown the approximate location for the new building. He agreed with representatives of Magnavox upon the location of the new poles so that the power line was to cross diagonally over the edge of the building to be constructed. According to the power board's representative, in determining the height of the poles carrying the new line, he assumed the new addition, when constructed, would be the same height as the old buildings. After the relocation of the poles, the building was constructed so that the transmission line passed diagonally over the edge of the building at a height of only 68 inches from the roof.

The line consisted of four three-phase uninsulated No. 4 copper wire with each wire carrying 7200 volts from phase wire to ground and between phase wires 12,400 volts. After the lines were relocated, the power company never inspected the construction site nor was there ever any warning signs placed on or around the building indicating that the wires carried a high voltage.

By stipulation there was admitted into evidence certain of the Johnson City ordinances, parts of the Southern Standard Building Code and the National Electrical Code that were contained in plaintiff's declaration. It is

not questioned that these codes were in full force and effect at the time of the accident.

The defendants do not deny but admit the aforesaid codes set recognized standards for the construction and maintenance of transmission lines. Johnson City has, by city ordinances, adopted those parts of the Southern Standard Building Code and National Electrical Code requiring a building permit and inspection of electrical installations as were constructed on the Magnavox property.

Mr. James E. Geiger, an electrical consultant engineer testifying as an expert witness, said the National Electrical Code was considered in the industry as setting up only minimum standards. Geiger further testified the National Electrical Code required transmission lines that carried 12,500 volts which crossed over or near buildings to have at least eight foot clearance. Additional requirements call for the use of insulated wire and that the area near the lines be "guarded by some personnel barricade" and the erection of signs saying "DANGER—HIGH VOLTAGE."

The undisputed evidence shows that no building permit was ever applied for or obtained. Neither was there ever any inspection of the electrical installation as required by the city ordinances. Also, the undisputed proof shows the transmission lines were lower than the eight foot requirement as set out in the National Electrical Code. Neither was there any barricade or signs as prescribed by the National Electrical Code.

At the time the trial judge sustained defendants' motions for directed verdicts, he said such action was reluctantly compelled by this Court's ruling in City of

Chattanooga v. Shackleford, 41 Tenn.App. 734, 298 S.W. 2d 743.

In Shackleford a workman was killed when a piece of gutter came in contact with electric wires. On appeal this court reversed a judgment for plaintiff and dismissed the action by directing a verdict on the grounds the decedent's contributory negligence was the sole and proximate cause of his death. Unquestionably the instant case is very similar to Shackleford on the facts. However, there are significant distinguishing features. In Shackleford there was only a question of ordinary negligence on the part of the defendant. In this case both defendants are charged with being grossly negligent. Also, in that case repair work, of which the defendant, so far as appears, was ignorant, was being done on an old building while in this case both defendants were aware that a new construction job was contemplated requiring the presence of workmen in close proximity to the uninsulated wires.

■ Our law is clear that contributory negligence will not bar recovery in an action based on gross and wanton negligence unless the contributory negligence is also gross and wanton. Stinson v. Daniel, 220 Tenn. 70, 414 S.W.2d 7; McConnell v. Jones, 33 Tenn.App. 14, 228 S.W.2d 117; Alabama Highway Express v. Luster, 51 Tenn.App. 691, 371 S.W.2d 182.

One may find many cases involving injury or death resulting from persons receiving shocks from electrical lines. The lengthy annotations and cases cited in 69 A.L.R.2d 9 and 84 A.L.R. 681 show there is little or no unity in the courts' holdings in electrical shock cases but each case must rest more or less on its own facts. How-

ever, a reading of the later cases seems to show a trend that the courts are becoming more prone to let such cases go to the jury. If such is a trend, it appears to be gaining favor in this state. Our Supreme Court, in Kingsport Utilities v. Brown, 201 Tenn. 393, 299 S.W.2d 565, denied certiorari on a split decision of this Court affirming judgments in favor of an employee of a machine shop who suffered electrical shocks when a crane came in contact with uninsulated wire. The judgments were against the power company and a moving company which was engaged to move the equipment of the machine shop. The late Justice Swepston, speaking for the Court, said:

"It does seem, therefore, that it is at least a question of fact about which the minds of reasonable men might differ as to whether a utility is negligent in having such high-powered voltage in lines uninsulated, running through the business section of towns. Of course the law does not require that all lines be insulated at any particular place but only where persons are likely to be and have a right to be, for business, pleasure or otherwise. Judge Felts has covered the question of foreseeability in his opinion in Spivey v. St. Thomas Hospital, 31 Tenn.App. 12, 211 S.W.2d 450."

In City of Lawrenceburg v. Dyer, 11 Tenn.App. 493, this Court in affirming a judgment for the plaintiff, quoted from the opinion of Justice Chambliss on a former appeal in the same case as follows:

" 'Recognizing as fundamental and general the principle that a company operating high-powered electric wires is under obligation to keep them in safe condition, if reasonably chargeable with knowledge, or if in the exercise of reasonable prudence bound to anticipate

that people may lawfully come in close proximity thereto for purposes of either business or pleasure, the New York Court of Appeals expressly held, in Braun v. Buffalo Gen. Elec. Co., 200 N.Y., 484, [94 N.E. 206,] 21 Am. & Eng.Dec.Ann., 370, that this was a question for the jury. And 9 R.C.L., 1227 supports with many authorities its text, to the effect that questions of negligence in the maintenance of such wires are for the jury "unless the negligence is so clear upon the evidence that intelligent minds cannot form different conclusions upon it." ' "

In addition to the above cases quoted from, it was held a question for the jury to determine whether or not the defendant power company should have foreseen that someone might come in contact with its wires in Walpole v. Tenn. Light and Power Co., 19 Tenn.App. 352, 89 S.W.2d 174; Rogers v. City of Chattanooga, 39 Tenn. App. 176, 281 S.W.2d 504; Town of Clinton v. Davis, 27 Tenn.App. 29, 177 S.W.2d 848; Coatney v. Southwest Tenn. Electric Membership Corp., 40 Tenn.App. 541, 292 S.W.2d 420; and International Harvester v. Sartain, 32 Tenn.App. 425, 222 S.W.2d 854. For cases in other jurisdictions wherein the question of the company's negligence was held for the jury, see Bennett v. N. Y. & Queens Elec. Light & Power Co., 294 N.Y. 334, 62 N.E.2d 219; Winegarner v. Edison L. & P. Co. (Kans.) 109 P. 778; Laudwig v. Cent. Missouri P. & L. Co. (Mo.) 24 S.W. 2d 625; Logan v. Empire Dist. Electric Co. (Kan.) 161 P. 659; McGinnis v. Del. L. & W. R. Co., 98 N.J.L. 160, 119 A. 163; Interstate Power Co. v. Thomas, 51 F.2d 964, 84 A.L.R. 681, and numerous cases therein cited. See also cases cited in 69 A.L.R.2d 9.

■ So far as the duty owed by a supplier of electricity, the law clearly requires the highest degree of care which skill and foresight can obtain. Such burden is placed on the supplier because electricity has been traditionally considered extremely dangerous. This duty of highest degree of care extends to every place where persons have a right to be whether it be for business, convenience or pleasure. International Harvester v. Sartain, supra.

As heretofore stated, the trial judge was of the opinion this case must be controlled solely by the holding in City of Chattanoga v. Shackleford, supra. We do not agree with this conclusion but think that International Harvester v. Sartain, supra, cannot be overlooked. In that case International Harvester was having a factory erected on its premises by Virginia Engineering Company, an independent contractor, in the same manner as Magnavox was having the building constructed in this case. Plaintiff received injuries from contact with a high voltage electric line installed by Virginia on International's property. As for the duty owed by the owner or occupier of the premises, the Court said:

"International had had a high power line installed and would have ample reason to expect Virginia to use the same facility and strength of current for a large number of consumers on the premises. The line was not put in for the use of Virginia alone but at the instance of International and for its benefit along with others it might employ.

"It thus became a supplier of electricity and we see no reason why it should not owe the same duty to the public properly upon the premises to exercise due care

such as repeatedly has been held as to power companies.''

We also think the court correctly stated the law applicable to a supplier of electricity 32 Tenn.App. at pages 454 and 455, 222 S.W.2d at page 867 when it said:

''Electricity if not properly safeguarded, is one of the most dangerous and lethal agencies known to man.

''Tennessee Electric Power Co. v. Sims, 21 Tenn.App. 233, 108 S.W.2d 801.

'' '* * * One who deals with an article which is imminently dangerous owes a public duty to all to whom it may come and who may be endangered thereby to exercise caution adequate to the peril involved, as for example, in giving notice of its dangerous character, and there need be no privity between him and the person injured * * *.' 45 C.J. 846, Sec. 264.

'' 'It is by no means necessary that the duty, violation of which may constitute actionable negligence, should arise out of contract but it may be a legal duty which may arise in various ways. It may be prescribed by statute or ordinance, a common law duty, or a duty imposed by implication of law. The duty may arise from the relation or situation of the parties. It may arise from the circumstances surrounding or attending an occurrence or transaction, as where one is using or dealing with a highly dangerous thing which, unless managed with the greatest care is liable to cause injury to bystanders or others. * * *' 45 C.J. 643, Sec. 18.

''With reference to electric companies it is said in 20 C.J. 345, Sec. 39, 29 C.J.S., Electricity, sec. 42: 'Loca-

tion of Wires and Appliances. The duty of exercising due care extends to every place where persons have a right to be, whether for business, convenience or pleasure, and extends to those upon the premises of consumers, and it makes no difference that the injury occurred on private property, and not in a public highway, if the person or animal injured had a right to be on such private property. The mere fact that there may be no contractual relationship between the parties does not change this principle. * * *' See City of Lawrenceburg v. Dyer, Adm'r., 11 Tenn.App. 493."

██ In this case we think it was error to direct verdicts for the defendants. The trial judge's statement made at the time the verdicts were directed shows some doubt in his mind as to the degree of care employed by defendants. He said:

"I concur, Mr. Dossett, that the proof is replete with negligence on the part of both defendants. They have not complied in numerous instances with the requirements of installation of electric lines. There's no question about that in the Court's mind. I think they are guilty of negligence, perhaps gross negligence * * *."

Further, we think it was error for the trial judge to overrule plaintiff's motion for new trial and rule the plaintiff was guilty of gross negligence. At the most, under the circumstances and conditions, whether or not plaintiff was guilty of ordinary negligence or gross negligence was a question of fact to be answered by the jury under proper instructions from the court.

Upon the evidence as presented, the jury might well find the defendants were guilty of gross negligence in erecting and maintaining an uninsulated 12,500 volt

transmission line only 68 inches above the roof of the building and that it was foreseeable persons would be working on the roof. It may be that the jury would find that the defendants should have reasonably foreseen that some workmen, such as plaintiff, through an ordinary act of negligence, might allow an iron pipe, gutter, mop handle or other conductor of electricity to come in contact with or so close to the wires as to be injured or killed.

If the jury should find it was reasonably foreseeable that an injury might result from the low hanging uninsulated wires and that the defendants failed to take necessary steps to prevent same, then in our opinion, it would be for the jury to say whether or not the defendants acted grossly negligent as well as determine what was the direct or proximate cause of the injury. As we have already said, if the jury should conclude the deceased was guilty of only ordinary negligence and find defendants guilty of gross negligence, deceased's negligence would not as a matter of law bar recovery.

For the foregoing reasons we are of the opinion it was error for the trial judge to direct a verdict in favor of the defendants. Thus, against both defendants a new trial is granted.

Let the costs incident to this appeal be equally divided between the defendants. All other costs will abide the outcome of the new trial and be taxed within the discretion of the trial judge.

McAmis, P. J., and Cooper, J., concur.